Jose V. Ferrer, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 70957.   Filed January 24, 1961.

*Samuel L. Siegel, Esq.*, for the petitioner.
*Edward N. Delaney, Esq.*, for the respondent.

620

OPINION.

OPPER, *Judge:*

*Issue 1.*

Without putting too fine a point upon it, it is clear that petitioner had acquired a beneficial interest of some nature in the book and play which later became "Moulin Rouge."

Defendant \* \* \* [the author] stresses the fact that all right, title and interest in the copyright were reserved to defendants by agreement. . However, it is the law that, though the title in the copyright of a play may be reserved to one of the parties, the exclusive licensee to present the play has an equitable interest therein. \* \* \* [citations omitted]. Defendants here were trustees of the copyright for the benefit of both themselves and plaintiff [who was given the exclusive right to present the play], and defendants may not, in justice, retain all the proceeds received by them as compensation for an unauthorized appropriation of the play which is owned in part by plaintiff. \* \* \* Where \* \* \* plaintiff by express agreement was to have not only an exclusive grant to produce the play but also a 50% interest in all sums derived from motion picture rights, there can be little doubt as to the justice of his claim to a share in defendants' recovery for the unauthorized production of the motion picture of the play \* \* \*. [*McClintic* v. *Sheldon*, 55 N.Y.S. 2d 879, 882 (1945) affirmed per curiam 295 N.Y. 682, 65 N.E. 2d 328 (1946).]

These rights were of sufficient significance to cause the ultimate producer's insistence on their acquisition by means of a "release" from petitioner before proceeding with production.[1] "The use of the word 'cancellation' is not determinative where something is transferred," as it was here. *Isadore Golonsky*, 16 T.C. 1450, 1451, affd. (C.A. 3) 200 F. 2d 72, certiorari denied 345 U.S. 939; cf. *Nat Holt*, 35 T.C. 588.

The remaining problems are what was the consideration and when was it paid. There is no specific provision in the final contract dividing the payments between those for petitioner's personal services and those for his property rights. This ambiguity was, however, resolved by the introduction at the trial, over respondent's vigorous objection, of oral and written evidence outside the contract itself.

Without resorting to the principle that such statements are admissible despite the parol evidence rule in litigation involving other parties, *Stern* v. *Commissioner*, (C.A. 2) 137 F. 2d 43, affirming a Memorandum Opinion of this Court; cf. *Commissioner* v. *Dwight's Estate*, (C.A. 2) 205 F. 2d 298, certiorari denied 346 U.S. 871, reversing 17 T.C. 1317, we can hence consider this evidence under the conceded principle that proof of preliminary negotiations is admissible in any event where the writing itself is silent or ambiguous. *Rasmussen* v. *New York Life Ins. Co.*, 267 N.Y. 129, 195 N.E. 821 (1935); *District of Columbia* v. *Northeastern Const. Co.*, (C.A.D.C.) 70 F. 2d 779.

Not only were the payments for these capital assets as so defined in paragraph 4(d) of the final contract made more than 6 months after petitioner's acquisition of his interest, but the contract under which

[1] The procedure by which this was accomplished was perhaps unnecessarily complicated. The producer acquired his purported title to the motion-picture rights from a third person to whom they had been granted by the author of the book and play. Petitioner "released" the author as to any rights in the motion picture which he had already acquired, and this "release" was delivered by petitioner in exchange for petitioner's contract with the producer.

they became due from the ultimate assignee was not entered into until after the period required by the capital gains section.[2] And respondent inferentially concedes that petitioner was not in the business of dealing in literary properties and that his interest in the book and play was consequently not held for sale to customers in the ordinary course of business. See *Pat O'Brien*, 25 T.C. 376, 386. Nor was it to any extent the consequence of, or consideration for, petitioner's personal services.[3] Cf. *Herman Shumlin*, 16 T.C. 407; *Irving Berlin*, 42 B.T.A. 668; *Nat Holt, supra*. See *Jack Benny*, 25 T.C. 197; *Julius H. (Groucho) Marx*, 29 T.C. 88.

It seems to us to follow that petitioner correctly reported the gains in dispute and that the deficiency must to that extent be disapproved. *Nat Holt, supra*.

### Issue 2.

All of the facts were stipulated and present a question of first impression under section 131, I.R.C. 1939.[4] Petitioner contends that

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

\* \* \* \* \* \* \*

(C) a copyright; a literary, musical, or artistic composition; or similar property; held by—

(i) a taxpayer whose personal efforts created such property, \* \* \*

\* \* \* \* \* \* \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income;

[3] This is not to say that personal services were in no way involved in petitioner's contract with the producer. The latter treated part of the payments as compensation for petitioner's acting services and these were so reported by petitioner.

[4] SEC. 131. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

(a) ALLOWANCE OF CREDIT.—If the taxpayer chooses to have the benefits of this section, the tax imposed by this chapter \* \* \* shall be credited with:

(1) CITIZENS AND DOMESTIC CORPORATIONS.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war-profits, and excess-profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; and

(2) RESIDENT OF THE UNITED STATES OR PUERTO RICO.—In the case of a resident of the United States and in the case of an individual who is a bona fide resident of Puerto Rico during the entire taxable year, the amount of any such taxes paid or accrued during the taxable year to any possession of the United States; and

\* \* \* \* \* \* \*

(d) YEAR IN WHICH CREDIT TAKEN.—The credits provided for in this section may, at the option of the taxpayer and *irrespective of the method of accounting employed* in keeping his books, be taken in the year in which the taxes of the foreign country or the possession of the United States accrued, subject, however, to the conditions prescribed in subsection (c) of this section. If the taxpayer elects to take such credits in the year in which the taxes of the foreign country or the possession of the United States accrued, the credits for all subsequent years shall be taken upon the same basis, and no portion of any such taxes shall be allowed as a deduction in the same or any succeeding year. [Emphasis added.]

he is entitled to a foreign tax credit for prior years' taxes paid and also for taxes accrued within the year in dispute. Respondent, on the other hand, claims that petitioner's credit is limited to taxes either paid or accrued, but not both, and that petitioner failed to elect the accrual method for purposes of section 131(d).

There can be no question that this section by its use of the phrase "irrespective of the method of accounting employed" is intended to be an exception to the general rule of section 41. Whether or not an accrual basis taxpayer would be permitted to credit cash tax payments in the absence of the stipulated election, we need not now decide. Cf. *Carter, Rice & Co.*, 28 B.T.A. 687. The only question here is whether petitioner, having attempted to exercise the accrual election though on a cash basis, may in the same year deduct cash payments for prior years' taxes.

The provision in question has been in effect for many years. Its purpose was to permit as a credit against United States taxes, payable for a given year, the foreign taxes applicable to the same year, even though not yet paid, or possibly even due.[5] To prevent distortions of tax liability at the taxpayer's option, and double credit of the same taxes, the condition was added that the election once made would continue for future years.

We see nothing in the language or purpose of the legislation inconsistent with what petitioner is here attempting. The statute clearly contemplates that exercise of the election will work some sort of change. Whenever there is a change in accounting methods, certain items will tend to double up or stretch out. Nothing strange or surprising has occurred here in this respect. "The fact that changes in accounting methods sometimes result in the bunching of income in the year of change is neither unique nor unusual." *Southeast Equipment Corporation*, 33 T.C. 702, 705, on appeal (C.A. 6). See also *C. L. Carver*, 10 T.C. 171, affirmed per curiam (C.A. 6) 173 F. 2d 29.

Respondent's position would have the effect of eliminating any true

---

[5] "Section 222 :. This section of the existing law allows a credit against the tax of the amount of income, war-profits, and excess-profits taxes paid to foreign countries during the taxable year of the taxpayer. Inasmuch as the tax laws of most of these countries, like our own, provide for the payment of income taxes during the year following the year for which the tax is imposed, it results that in many cases the credit is taken against the United States tax for the year following the year in which was earned the income on which the foreign tax was imposed. This defect is remedied by subdivision (c) of the bill, which provides that the credit may be taken at the option of the taxpayer in the year in which the taxes of the foreign country accrued.

"Example: A in 1924 has income of $100,000 on which he pays in the following year a tax to a foreign country of $10,000. In 1925 he has income of $8,000 on which he pays a tax to the foreign country of $500. Under the existing law he may be forced to take as a credit against his tax due the United States on the $8,000 the $10,000 of tax paid the foreign country. Under the bill he may take as a credit against the tax due the United States on the $100,000 of income the amount of tax paid to the foreign country on the same income." (S. Committee Print, 68th Cong., 1st Sess. (1924), p. 22 (Statement of the Changes Made in the Revenue Act of 1921 and the Reasons Therefor).)

election except in the first year in which any return is filed. In any subsequent year, if respondent is sustained, a taxpayer may exercise the election only under pain of giving up the credit for prior taxes which may not have been actually paid. Such a construction is neither necessary nor in accord with the legislative purpose.

In this respect also, we regard the deficiencies as erroneous.

To take account of conceded items,

*Decision will be entered under Rule 50.*