HARRY F. GUGGENHEIM AND ESTATE OF ALICIA P. GUGGENHEIM, DECEASED, HARRY F. GUGGENHEIM, DOROTHY J. HOLDSWORTH, AND MORGAN GUARANTY TRUST COMPANY OF NEW YORK, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4416–64. Filed August 9, 1966.

*Robert W. Wales*, for the petitioner.
*Paul H. Frankel*, for the respondent.

SIMPSON, *Judge:* Respondent determined deficiencies in income tax of $78,061.47 for the taxable year 1958 and $322,298.91 for the taxable year 1959. The only issue for decision is whether petitioner's sale of shares in a syndicate relating to the stallion "*Turn-To" [1] resulted in his receipt of ordinary income or whether such sale was a sale or exchange of property used in a trade or business as defined in section 1231(b) of the Internal Revenue Code of 1954.[2]

FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners are Harry F. Guggenheim and the Estate of Alicia P. Guggenheim, deceased, Harry F. Guggenheim, Dorothy J. Holdsworth, and Morgan Guaranty Trust Co. of New York, executors. When used in the singular, "petitioner" refers to Harry F. Guggenheim. Harry F. Guggenheim and Alicia P. Guggenheim were husband and wife and filed joint income tax returns, using the cash method of accounting for 1958 and 1959 with the district director of internal revenue, Manhattan, N.Y. Alicia P. Guggenheim died on July 2, 1963.

Petitioner is the senior member of the mining firm of Guggenheim Bros., the editor and publisher of Newsday, and. is, and has been for a number of years, engaged in the business of breeding and racing thoroughbred horses under the name "Cain Hoy Stable."

*Turn-To is a thoroughbred stallion that was born in 1951 and purchased by petitioner on July 31, 1952, as a yearling, for $20,000. In 1953, *Turn-To won the Garden State Stakes, then the richest race in the world for 2-year-old horses, and his total earnings for the year exceeded $175,000. During the first part of 1954, racing as a 3-year-old, *Turn-To won over $100,000. However, after winning the Flamingo Stakes in Florida during that year, *Turn-To suffered an injury and was thereafter held and used by the petitioner for breeding purposes.

On April 12, 1954, *Turn-To was sent by petitioner to stand at stud at Claiborne Farm, Paris, Ky., which is owned and operated by A. B. Hancock, Jr. *Turn-To remained at Claiborne Farm until December 5, 1960, on which date he was sent, by the decision of the petitioner,

---

[1] The asterisk indicates that the horse was foreign bred.
[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

to Spendthrift Farm, Lexington, Ky., which is owned and operated by Leslie Combs II. *Turn-To has since been kept at Spendthrift Farm. Both of these farms are independent establishments unrelated to petitioner, and both farms stand many horses of their own, as well as horses owned by other horse breeders.

*Turn-To's stud fee for a "service" or "season" was $3,500 for the 1955 breeding season.[3] In his first year at stud, *Turn-To sired the colt First Landing, which was foaled in 1956 and won the Garden State Stakes in 1958. The total winnings of First Landing exceeded $750,000. Other successful colts sired by *Turn-To include Waltz, Hail To Reason, Rideabout, Sir Gaylord, Cyane, Dead Ahead, Hoist Him Aboard, and Lucky Turn.

When a horse first goes to stud, its stud fee is predicated in large part on its prior success in racing, and after the horse has been at stud for a sufficient number of years that its offspring are actively engaged in racing, the value of a stud horse and its stud fee are based on the quality and number of its offspring and their success at the race track.

Due to the success of *Turn-To's offspring in racing, *Turn-To's stud fee was increased to $5,000 for a season in 1959. The advertised fee for a season in 1960 was $10,000. Since 1960, seasons have been sold for $12,000, $12,500, and $15,000. The value of the stallion also increased. In 1955, petitioner insured * Turn-To for $200,000; in 1958, the insurance on his interest in the horse was increased to $500,000; and, in 1960, to $850,000.

It is customary in the thoroughbred breeding industry to agree to require payment of the fee for a stud service only when the mare is known to be pregnant, and the usual agreement provides that the fee is to be returned if the mare does not bear a live foal as the result of the breeding.

The petitioner reported as ordinary income the following amounts from *Turn-To's stud fees: $59,500 for 1955, $63,000 for 1956, $63,000 for 1957, and $63,000 for 1958. Petitioner also bred several of his own mares to *Turn-To during these years.

In January 1958, petitioner entered into five agreements, which were alike except for the name and address of the party of the second part, with five different individuals. Under these agreements, petitioner retained "complete, sole and exclusive right of management and supervision" of *Turn-To. The parties of the second part received the right to breed one thoroughbred mare each year to *Turn-To for the rest of *Turn-To's life. For years when *Turn-To can be bred less than five times, the parties of the second part are to draw lots for the available seasons. The owners of the lifetime seasons have insurable interests

---

[3] The words "service" and "season" are used interchangeably throughout this opinion. In the horse breeding industry, these words are used to describe the process of breeding a stallion to a mare.

in their rights under the lifetime seasons agreements. Annual rights to breed with *Turn-To can be sold by the owners of the lifetime seasons, and the lifetime seasons can be sold or assigned to third parties. Petitioner received, during 1958, $22,500 under each of these agreements.

On October 20, 1958, after First Landing won the Garden State Stakes, petitioner entered into an agreement, captioned "*Turn-To Syndicate Agreement," with 15 persons who executed counterparts thereof. The agreement was the result of arm's-length dealing with persons who were not related by blood or marriage to the petitioner. Pursuant to the agreement, each of the 15 individuals or entities agreed to pay petitioner $40,000, $10,000 of which was payable in 1958 and the balance payable subsequently. The payments were made as agreed, and petitioner received $150,000 during 1958, $420,000 during 1959, and $30,000 in subsequent years. Petitioner reported the amounts he received under this agreement as being taxable as long-term capital gains. In this connection he included in his net long-term capital gains amounts aggregating $148,317.07 for 1958 and $415,287.78 for 1959.

The *Turn-To Syndicate Agreement purported to sell undivided interests in the stallion. It provides that the ownership of *Turn-To shall be in 35 shares, petitioner retaining 20 shares (5 of which were reserved for fulfillment of the lifetime seasons) and the 15 individuals or entities each purchasing 1 share. Each of the 35 shares is on an equal basis with all other shares and is indivisible, with only a full share representing ownership of an undivided one-thirty-fifth interest in *Turn-To.

Under the agreement, *Turn-To must stand and be kept and maintained at such farm or breeding establishment in central Kentucky as the petitioner shall select. Petitioner, or his designated representative, has the complete, sole, and exclusive right of management and supervision of *Turn-To. Petitioner paid the prevailing rate for the keep and maintenance of the stallion, and all costs and expenses incident thereto, from the date of the agreement through January 1, 1960. Since January 1, 1960, each shareholder has been obligated to pay his proportionate share of all charges, costs, and expenses incurred for the keep, maintenance, and advertising of the stallion. This proportionate share amounted to $135.34 in 1960, $163.32 in 1961, $149.74 in 1962, and $169.96 in 1963.

In the discretion of petitioner, as the "syndicate manager," one free annual service to *Turn-To can be given to the owner or operator of the farm or breeding establishment at which the stallion is standing.

Under the agreement, petitioner, as syndicate manager, or his designated representative, shall advertise the stallion, select the veterinarian for the stallion, and establish the annual stud fee and terms and conditions of service. Thus far, the farm at which *Turn-To has stood has

performed the first two of these duties, and *Turn-To's stud fee has not been raised since 1960, although several services have been sold by shareholders at higher amounts.

Should petitioner die or resign as syndicate manager during the continuance of the agreement, his successor is to be selected by the shareholders, with each shareholder being entitled to cast one vote for each share owned by him in the stallion. Petitioner, or, if deceased, his personal representative, would be entitled to cast one vote for each share then owned by him or his estate, including five votes for the five reserved shares.

The agreement further provides that the syndicate manager, or his designated representative, shall employ, or cause to be employed, the usual and customary care in standing, keeping, and maintaining *Turn-To, but shall not be responsible for any injury to, or disease or death of the stallion, nor for any injury to, disease, or death of any mare resulting from the breeding or attempted breeding to the stallion.

The owner of each full share in *Turn-To is entitled, during the breeding season of 1960 and each breeding season thereafter, to breed, without charge, one thoroughbred mare (in sound breeding condition and free from infection and disease) for each share each year.

If the veterinarian attending *Turn-To at any time certifies that in his opinion it would be in the best interest of *Turn-To to be bred to less than 35 mares in any season, then the holders of the five lifetime seasons are entitled to the first available seasons. The shareholders in the stallion are then entitled to the remaining reduced number of seasons, to be determined by lot. Each shareholder drawing a blank for a preceding season is entitled to a service, without drawing, before any owner who drew a positive slip in the preceding season is entitled to participate.

If the veterinarian attending *Turn-To certifies that in his opinion *Turn-To can be bred to more than 35 mares in any year, additional yearly seasons ("excess seasons") may be sold by the syndicate manager, or his designated representative, and the proceeds from any such sales may be credited upon the account for the board, keep, maintenance, advertising, and other expenses of the stallion, or divided proportionately among the shareholders, as the syndicate manager shall elect. Each shareholder received as his proportionate share of the proceeds from the sale of excess seasons $571.43 in 1960, $571.42 in 1961, $1,142.85 in 1962 ($285.71 was refunded because a mare serviced was found to be barren), and $285.72 in 1963. The expectation by a shareholder of profits from the sale of excess seasons depends on the intentions of the syndicate and the syndicate manager, who may believe that their interests would be best served by limiting the number of excess seasons sold. In 1961, each shareholder of *Turn-To received his proportionate share of an award received by *Turn-To in the 1961

National Stallion Stakes, sponsored by the New York Racing Association. *Turn-To was entered in the Stakes by Claiborne Farm, and the syndicate received a $3,300 breeders award because Sir Gaylord, an offspring of *Turn-To, won the colt division of the race.

Each shareholder in the syndicate is entitled to sell his share subject to a right of first refusal in the other shareholders. A shareholder who wishes to sell his share must notify the syndicate manager, who must in turn notify the other shareholders that a share is being offered for sale. If none of the shareholders desires to purchase the share at the price being offered by the prospective purchaser, the selling shareholder may go forward with the sale. If more than one shareholder desires to purchase the additional share, the shareholder entitled to purchase is determined by drawing lots.

The agreement also provides that a shareholder may sell his annual season to the stallion at a price not less than the advertised stud fee for a season. The shareholder must notify the syndicate manager that he intends to sell a season, and the syndicate manager prepares a standard contract to be used by all shareholders for the sale of seasons. A shareholder in *Turn-To may trade a season for a season to another stallion in his discretion, but notice of a trade must be given to the syndicate manager.

The syndicate manager is not responsible for insuring *Turn-To, but any shareholder may insure his share or shares in the stallion for his own benefit. Some, if not all, of the shareholders have insured their interests in *Turn-To. The syndicate manager must furnish each shareholder with an annual statement showing the results of the preceding breeding season and the receipts and expenditures of the preceding calendar year.

If a syndicated horse stands in Kentucky, a shareholder must pay the Kentucky ad valorem taxes on livestock. In addition, a shareholder bears the risk of the horse dying, being injured, or becoming diseased, as well as the risk that the horse will not prove to be a good breeder. The primary reason that a purchaser of a share in a syndicated stallion held for breeding purposes makes a purchase is to gain access to the stallion, either for his own use or to sell or trade the share or the rights that the share gives him.

At the time of the sales of the syndicate shares in *Turn-To, the future income of *Turn-To could not be predicted with reasonable accuracy beyond a period of about a year, and there is no generally accepted rule in the industry for basing an estimate of a horse's value solely on current or estimated future earnings. With a fertile horse and a mare with a good production record, a foal can be expected from a service 2 out of 3 years. Generally, a stallion is presumed to be useful at stud until he is 15 to 17 years old or more.

Between October 20, 1958, the date of syndication, and December 31, 1964, a number of shareholders in the *Turn-To syndicate transferred their shares at prices ranging from $40,000 to $60,000. These transfers were accomplished by the payment of the purchase price from the transferee to the transferor, the return of the transferor's counterpart of the syndicate agreement to petitioner, and the entering into a new counterpart between the petitioner and the transferee. The transferees did not participate in the preparation of the new counterpart, which, in all cases, was substantially identical to the original counterparts.

After the syndication of *Turn-To, petitioner, on his records, stopped taking depreciation on the entire horse and began taking depreciation on only a four-sevenths interest. Some, if not all, of the shareholders capitalized their interests in the horse after the purchase of the shares and depreciated those interests.

## OPINION

Petitioner contends that the gain received by him from the sale of shares in the "syndication" of *Turn-To should be taxed as long-term capital gain. His reasoning is that the shares represent undivided ownership interests in *Turn-To, and therefore, what was sold was ownership of a horse. A horse is livestock within the meaning of section 1231(b)(3) and, since the horse was held by petitioner for breeding purposes, is property used in the trade or business. Accordingly, petitioner argues that the gain on the sale of the shares should be taxed, as provided in section 1231(a), as gain from the sale of a capital asset held for more than 6 months.

Respondent contends that, in substance, what petitioner sold were the mere rights of breeding mares to *Turn-To and that such rights, since petitioner was in the business of selling breeding rights, are excluded from treatment as section 1231 property. Respondent also contends that, regardless of the characterization of what was sold, the sale transaction does not qualify as a sale of section 1231 property since the consideration petitioner received for the sale was essentially a lump-sum substitute for future stud fees, which would have been ordinary income if received.

Section 1231(b), in relevant part, defines "property used in the trade or business" as follows:

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject

to the allowance for depreciation provided in section 167, held for more than 6 months, * * * which is not—

\* \* \* \* \* \* \*

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

\* \* \* \* \* \* \*

(3) LIVESTOCK.—Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.

The parties agree that something was sold by reason of the syndication of *Turn-To but do not agree on what was sold. The syndication agreement purports to pass undivided ownership interests, and while the form and language of the agreement are not conclusive as to the true character of the transaction, they are of some relevance. See *Comtel Corp.*, 45 T.C. 294 (1965). Moreover, the actions of the parties were consistent with the sale of undivided ownership interests. Petitioner, on his records, stopped taking depreciation on the entire horse and began taking depreciation on only a four-sevenths interest. Some of the shareholders, if not all, capitalized their interests in the horse after the purchase of the shares and depreciated those interests. Petitioner, after the syndication, insured only his interest in the horse. Some of the shareholders, if not all, insured their interests in the horse after the purchase of the shares.

However, respondent contends that we should not be guided by the form of the transaction, but that its substance should determine the incidence of taxation; we agree that we should not be guided wholly by the form. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945). Respondent argues that petitioner and his veterinarian decided that *Turn-To could be bred to approximately 40 mares a year. Therefore, when the ownership was divided into 35 shares, each shareholder essentially received only the right to breed 1 mare per year to *Turn-To. The few additional seasons were used to give one season to the farm at which *Turn-To was standing and, through selected sales, to offset the expenses of *Turn-To's maintenance. Hence, there was little likelihood that a shareholder would receive any significant amount of income from *Turn-To's breeding activities or incur any significant amount of expense. The shareholders primarily received only the right to breed mares to *Turn-To. In addition, petitioner reserved five shares specifically for the purpose of taking care of the prior sale of five lifetime seasons.[4] Further, petitioner not only retained control of *Turn-To through his retention of a majority of the shares and his

---

[4] The tax treatment of the sale by petitioner of lifetime seasons in *Turn-To is not before the Court. We are, however, for the purpose of presenting respondent's arguments in their strongest light, assuming, but not deciding, in this opinion that the sale of lifetime seasons would result in the receipt of ordinary income.

self-appointment as syndicate manager, but he also retained possession of *Turn-To through his power to name the farm, within geographical limits, at which *Turn-To must stand.

Respondent's argument merits serious consideration. The differences between ownership of property having a limited life and the right to the full enjoyment and use of that property for its life are not appreciable. It can be argued that there are no significant economic differences. However, the tax law treats the sale of capital assets or section 1231 assets very differently from the realization of business income, and therefore, we must place this transaction in one category or the other.

Petitioner retained effective control and possession of *Turn-To. Such retention is consistent with the sale of lifetime rights to use *Turn-To, but it is also consistent with the sale of minority ownership interests in the horse. If, then, we look only at the rights and obligations of petitioner, we see no significant differences between the sale of minority interests in *Turn-To and the sale of lifetime rights to use the horse. In the sale of both, petitioner would relinquish absolute control over the horse in that he could not disregard the interests of the purchasers. Since there are no significant differences in petitioner's rights and obligations between the sale of minority ownership interests and the sale of lifetime rights for the use of *Turn-To, the retention of such control does not persuade us to alter the form of the transaction.

An examination of the rights and obligations of a purchaser of a minority ownership interest in *Turn-To, as opposed to the rights and obligations of a purchaser of a lifetime season in *Turn-To, does reveal significant differences. Both the purchasers of shares and the purchasers of lifetime seasons receive the right to breed one mare a year to *Turn-To. Both can sell or trade these seasons. Both receive interests that are insurable. But a shareholder shares in the expenses of maintaining *Turn-To; a lifetime season holder does not. A shareholder is entitled to share in any profits earned by the horse, including the proceeds of the sale of excess seasons; a lifetime season holder is not. A shareholder may be subject to liability for damages as a result of his ownership; a lifetime season holder is not. A shareholder must pay the Kentucky ad valorem taxes on livestock; a lifetime season holder does not. Should petitioner resign as syndicate manager, a shareholder is entitled to vote for his successor; a lifetime season holder is not. And, each shareholder has a right of first refusal to purchase the share of any other shareholder who wishes to sell his share; an owner of a lifetime season has no such right.

We agree with respondent that, due to the arrangement of the syndicate, the rights and obligations of a shareholder may have no substantial economic value above and beyond the rights and obligations

of a lifetime season holder. However, they are substantive indicia of ownership, and, when combined with the form of the transaction, lead us to believe that the property interests transferred by the syndication agreement should be considered undivided ownership interests in *Turn-To.

Respondent next argues that even if the sale of shares in *Turn-To was the sale of undivided ownership interests in the stallion, such a sale still cannot be considered a sale or exchange of section 1231 property in view of the construction that the Supreme Court has placed upon that section and section 1221 in the cases of *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958); *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955); and *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130 (1960).

In the *Lake* case, the taxpayer corporation had a working interest in two commercial oil and gas leases. In return for cancellation of a debt to its president, the taxpayer assigned him an oil payment right in the amount of $600,000 plus an amount equal to interest at 3 percent a year on the unpaid balance. The oil payment right was payable out of 25 percent of the oil attributable to the taxpayer's working interest in the two leases. At the time of the assignment, it could have been estimated with reasonable accuracy that the assigned oil payment right would pay out in 3 or more years, and it did in fact pay out in a little over 3 years. In other words, the taxpayer "carved out" of his property interest a lesser interest, limited in duration and ascertainable with considerable accuracy, so that in time the taxpayer recovered the full interest to the same extent as before the assignment. The Court stated at pages 265–266:

We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. The pay-out of these particular assigned oil payment rights could be ascertained with considerable accuracy. * * * cash was received which was equal to the amount of the income to accrue during the term of the assignment, the assignee being compensated by interest on his advance. The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property.

These arrangements seem to us transparent devices. Their forms do not control. Their essence is determined not by subtleties of draftsmanship but by their total effect. * * *

Respondent places heavy reliance on the phrase in *Lake*, "essentially a substitute for what would otherwise be received as ordinary income." Respondent argues that petitioner would have received, if he had retained full ownership of *Turn-To, stud fees from the sale of annual seasons that would have been taxable as ordinary income. Respondent also argues that petitioner established his price for a share

in *Turn-To in large part on the basis of a capitalization of the expected future earnings of *Turn-To. Therefore, respondent argues, petitioner essentially received a lump-sum substitute for what would otherwise have been received as ordinary income.

We do not believe that the rationale of *Lake* is applicable to the present case. Simply because the property transferred will produce ordinary income, and such income is a major factor in determining the value of the property, does not necessarily mean that the amount received for the property is essentially a lump-sum substitute for ordinary income. See, *United States* v. *Dresser Industries, Inc.*, 324 F. 2d 56 (C.A. 5, 1963) ; *Commissioner* v. *Ferrer*, 304 F. 2d 125 (C.A. 2, 1962), reversing in part 35 T.C. 617 (1961) ; *Metropolitan Building Co.*, 31 T.C. 971 (1959), acq. 1959–2 C.B. 6, reversed in part 282 F. 2d 592 (C.A. 9, 1960) ; Surrey, "Definitional Problems in Capital Gains Taxation," 69 Harv. L. Rev. 985 (1956).

The Court in *Lake* was faced with the problem whether a transfer of part of a capital asset is itself the transfer of a capital asset. That part was defined and delineated by the taxpayer in such a manner as to consist essentially of only the rights to income. The transferee assumed few of the risks identified with the holding of a capital asset; he assumed only a nominal risk of his oil payment right decreasing in value and none of the possibility of the oil payment right increasing in value. On the other hand, the taxpayer, after the transfer, retained essentially all of the investment risks involved in his greater interest to the same extent as before the transfer.

In other words, since we are attempting to ascertain whether a capital asset is being transferred, it is often easier to see if the investment risks identified with the holding of such an asset are transferred. In *Lake*, essentially what was transferred was the right to receive ordinary income, and few of the risks involved in holding the property or asset that was the source of the income were transferred. However, in this case, petitioner transferred all investment risks in a three-sevenths interest in *Turn-To. If the value of *Turn-To had subsequently increased (and there is evidence that it did), petitioner would not have shared in this increase to the same extent as he would have before the syndication. The shareholders, as to their interests, would have received all of the benefit of an increase in the value of *Turn-To. Likewise, the shareholders, as to their interests, would have received all of the burden of any decrease in the value of *Turn-To.

The second case on which respondent relies, *Corn Products Co.* v. *Commissioner*, *supra*, involved a taxpayer which purchased and sold corn futures as an integral part of its business. The taxpayer entered into these futures transactions to assure an adequate supply of corn and to protect its manufacturing operation against a price increase in this principal raw material. The Court stated that "Congress intended

that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss."

The corn futures which were bought and sold by Corn Products Co. were property not specifically excluded from the statutory definition of capital assets. However, the taxpayer had not purchased the corn futures for investment purposes and then sold for the purpose of terminating such investments. Rather, the taxpayer had bought and sold the corn futures as an integral part of its business. The transactions were business operations and not capital transactions.

Respondent attempts to use *Corn Products* by arguing, once again, that petitioner did not sell ownership interests but sold lifetime breeding rights. Respondent then states that selling breeding rights, either year-by-year or for the life of the horse, was an integral part of petitioner's breeding business, and the acquisition of shares by the shareholders was at least partly made to assure them access to \*Turn-To for all future years.

*Corn Products* was not concerned with the purposes of the purchasers of the corn futures from the taxpayer. So here, we are not concerned that the shareholders may have purchased shares in \*Turn-To to assure themselves seasons furnished by the stallion. Instead, we are concerned with the horse-breeding business of the petitioner and the relationship between the sale of the syndicate shares and that business. In *Corn Products*, the Supreme Court concluded that the purchase and sale of the corn futures were not capital transactions because the company engaged in such transactions in order to further its trade or business. However, we find no such purpose on the part of the petitioner in selling the syndicate shares. He purchased a horse, raced the horse as long as it was fit for this purpose, retired the horse to stud, and several years thereafter sold ownership interests in the horse. Thus, in the transaction with which we are concerned, the petitioner was merely liquidating a part interest in livestock held for breeding purposes, and was not selling property for the purpose of furthering his horse-breeding business.

The third case on which respondent relies, *Commissioner v. Gillette Motor Co.*, *supra*, involved a temporary taking of the taxpayer's property by the Government. During the latter part of the Second World War, the Government took over the control and operation of Gillette's facilities for approximately 10 months. Gillette was awarded compensation for the takeover, based on the fair rental value of the facilities. Gillette argued that the takeover by the Government was a transfer of what is now section 1231 property, but the Court stated that though a property interest was transferred, such interest was merely an incident—the right to use the facilities—of the underlying physical property. The Court then stated that this property interest, even

though not specifically excluded from the definition of property used in the trade or business, was not the type of property to which Congress had intended to accord capital gain treatment. The Court noted that the taxpayer had no investment in the property interest transferred, and the interest was "manifestly not of the type which gives rise to the hardship of the realization in one year of an advance in value over cost built up in several years."

The *Gillette* case is fully consistent with *Lake*. In *Gillette*, there was not a complete termination of even a part of the taxpayer's investment in its facilities with the risks involved in such an investment. No substantial investment risks were transferred to the Government, which indicates that there was no transfer of a capital or income-producing asset. The Court stated that if the Government had taken a fee in the property, the result would have been different. In other words, some investment risks would have been transferred to the Government.

In the present case, substantial investment risks involved in the ownership of *Turn-To were transferred to the shareholders. We accordingly believe that petitioner did transfer the type of asset that Congress intended to receive capital gain treatment. The value of *Turn-To increased over a substantial period of time, and the interests transferred were of the type that gives rise to the hardship of the realization in 1 year of an advance in value over cost built up in several years.

Respondent makes a further argument as to why petitioner's gain from the sale of the syndicate shares should be denied capital gain treatment. This argument is that where property is purchased to reach underlying assets to be used in a trade or business, or for ordinary business purposes, the property is not, in the hands of such a purchaser, a capital asset. *John J. Grier Co.* v. *United States*, 328 F. 2d 163 (C.A. 7, 1964); *Western Wine & Liquor Co.*, 18 T.C. 1090 (1952), acq. 1958–1 C.B. 6, appeal dismissed 205 F. 2d 420 (C.A. 8, 1953). Respondent would apply this argument here since the primary purpose of the shareholders in acquiring shares was to obtain access to *Turn-To. However, we are not here concerned with whether the syndicate shares would be capital assets in the hands of the shareholders. The cases cited by the respondent dealt with the purpose of the taxpayer in acquiring the property in question. Thus, those cases are only relevant in classifying the interests of the syndicate shareholders; they are not relevant in determining what kind of interests were sold by the petitioner.

A further argument is made by respondent that even if the shares in the syndicate do represent ownership of a horse held for breeding purposes, the shares themselves were not held for breeding purposes but were held primarily for sale to customers in the ordinary course of petitioner's business. We believe that we have disposed of this argument by our holding that petitioner did sell undivided ownership

interests in a horse held for breeding purposes. We cannot find that an undivided ownership interest is of a different character from a whole ownership interest. In effect, respondent here seems to be arguing that petitioner was not holding *Turn-To for breeding purposes but primarily holding the horse for sale, by way of the sale of shares, in the ordinary course of his business. But we have found as a fact—a fact to which respondent stipulated—that *Turn-To was held for breeding purposes.

Respondent makes other arguments, regarding section 1231, based on the assumption that what petitioner transferred was in substance not undivided ownership interests in *Turn-To but future breeding rights to the horse. Since we have found that petitioner did, in substance, transfer undivided ownership interests in *Turn-To, it is not necessary to discuss the validity of these arguments. *Turn-To was livestock held by petitioner for breeding purposes and held by him for 12 months or more from the date of acquisition. Since the sale of undivided ownership interests in *Turn-To was the sale of property used in the trade or business, we conclude that it was a sale of a section 1231 asset.

In order to reflect the agreement of the parties concerning other adjustments in the notice of deficiency,

*Decision will be entered under Rule 50.*