*Decisions will be entered under Rule 155.*

HOWARD G. KINGSBURY AND ANNA Z. KINGSBURY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8444-72.    Filed March 3, 1976.

*Horace N. Freedman* and *Stephen Solomon,* for the petitioners.
*Robert G. Martinell,* for the respondent.

OPINION

Sekyra has, since before 1958, owned and been licensed to operate a cardroom known as the Pass Club in Ventura County, Calif. A county ordinance passed in 1958 prohibited the operation of cardrooms except with respect to cardrooms which on the effective date of the ordinance were being operated pursuant to an already existing valid license. Cardroom licenses in effect on the date of the ordinance remained valid only for the place and operator stated in the license and were made nontransferable. In 1962 Sekyra entered into a written agreement with petitioner whereby petitioner agreed to manage and operate the club for a period of 5 years. Petitioner had the right to extend the agreement for two additional 5-year terms. Under the written agreement petitioner agreed to pay Sekyra $7,500 at the outset and he also agreed to pay Sekyra the first $2,000 of the gross income generated by the club each and every month during the term of the agreement. Petitioner was to retain all gross income in excess of $2,000 per month. Under petitioner's direction the club generated gross income substantially in excess of $2,000 per month. During the period from May 1962 through November

1965 petitioner increased the amount of monthly payments to Sekyra so that by November 1965 he was paying her $6,000 per month.

In November 1965 the county board of supervisors determined that the agreement between Sekyra and petitioner was in violation of the ordinance prohibiting the transfer of a license to operate a cardroom. Sekyra's license was consequently suspended for a period of 60 days and she was admonished to terminate the agreement between petitioner and herself. In January 1966 Sekyra and petitioner entered into a settlement agreement terminating their prior operating agreement. Under the terms of the settlement agreement, petitioner was to receive a lump-sum payment of $14,000 plus 25 percent of the first $416,000 of gross receipts resulting from the operation of the club in each year until February 26, 1977.

### 1. Characterization of Payments Received Pursuant to the Settlement Agreement

The primary issue presented for our decision is the characterization of the payments received by petitioner, pursuant to the settlement agreement, during the years 1966, 1967, 1968, and 1969. Petitioner reported the payments as capital gains and urges the Court to endorse that characterization. In support of his position, petitioner maintains that in substance the operating agreement granted him a leasehold in the Pass Club. In petitioner's view this lease constituted depreciable property used in his trade or business, the cancellation of which, by virtue of the settlement agreement, produced capital gains under section 1231. Respondent, on the other hand, characterizes the payments as ordinary income received upon the cancellation of a contract to perform personal services. Respondent also maintains that regardless of the label placed upon petitioner's rights under the operating agreement, the termination of those rights did not constitute a sale or exchange as required under section 1231. Finally, respondent argues that even if there was a sale or exchange, petitioner's rights did not constitute property within the meaning of section 1231.

In order to prevail under section 1231 petitioner must establish that he sold or exchanged "property used in his trade or business," as that phrase is defined in section 1231(b). Section 1231(b) provides in part:

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

(C) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by a taxpayer described in paragraph (3) of section 1221.

Petitioner must establish that his rights under the operating agreement: (1) Constituted property; (2) were used in his trade or business; (3) were subject to allowance for depreciation; and (4) were held by petitioner for more than 6 months.

We will consider first whether petitioner's rights constituted property within the meaning of section 1231. Contrary to petitioner's assertion that the term "property" does not have the same restrictive meaning for purposes of section 1231 as it does for purposes of section 1221 (relating to the definition of capital asset), the Supreme Court has concluded that property has exactly the same meaning for purposes of both sections. *Commissioner v. Gillette Motor Co.,* 364 U.S. 130 (1960). The question then becomes whether petitioner's bundle of rights under the operating agreement constituted a capital asset within the meaning of section 1221, disregarding the exclusion in section 1221(2). A right or bundle of rights may be considered property under State law and yet not be considered property for purposes of the capital gains provisions. *Commissioner v. Gillette Motor Co., supra; Commissioner v. P. G. Lake, Inc.,* 356 U.S. 260 (1958). Generally a contract right to earn ordinary income in the future by the performance of personal services is not deemed a capital asset and any amount received for the transfer of such a right is treated as a substitute for ordinary income and is taxed accordingly.[7] *General Guaranty Mortgage Co. v. Tomlinson,* 335 F. 2d 518 (5th Cir. 1964); *United States v. Woolsey,* 326 F. 2d 287 (5th Cir. 1963); *Hyatt v. Commissioner,* 325 F. 2d 715 (5th

---

[7] See Eustice, "Contract Rights, Capital Gain, and Assignment of Income—the Ferrer Case," 20 Tax L. Rev. 1 (1964).

Cir. 1963), affg. a Memorandum Opinion of this Court; *Bisbee-Baldwin Corp. v. Tomlinson,* 320 F. 2d 929 (5th Cir. 1963); *United States v. Eidson,* 310 F. 2d 111 (5th Cir. 1962); *Holt v. Commissioner,* 303 F. 2d 687 (9th Cir. 1962), affg. 35 T.C. 588 (1961); *Harry M. Flower,* 61 T.C. 140 (1973), affd. 505 F. 2d 1302 (5th Cir. 1974); *Joseph W. Brown,* 40 T.C. 861 (1963). On the other hand, the sale or exchange of an exclusive right to use or possess specific property will produce capital gain. *United States v. Dresser Industries, Inc.,* 324 F. 2d 56 (5th Cir. 1963); *Commissioner v. Ferrer,* 304 F. 2d 125 (2d Cir. 1962), revg. in part 35 T.C. 617 (1961); *Commissioner v. McCue Bros. & Drummond, Inc.,* 210 F. 2d 752 (2d Cir. 1954), affg. 19 T.C. 667 (1953), cert. denied 348 U.S. 829 (1954); *Commissioner v. Ray,* 210 F. 2d 390 (5th Cir. 1954), affg. 18 T.C. 438 (1952), cert. denied 348 U.S. 829 (1954); *Commissioner v. Golonsky,* 200 F. 2d 72 (3d Cir. 1952), affg. 16 T.C. 1450 (1951), cert. denied 345 U.S. 939 (1953).

The cases distinguishing a contract right associated with an interest in property from a mere right to earn income in the future have arisen from a variety of circumstances. Payments received by a lessee for the termination of a lease are treated as capital gain, *Commissioner v. Golonsky, supra,* and *Commissioner v. McCue Bros. & Drummond, Inc., supra.* Similarly a lessee's right to prevent his landlord from renting space to a competitor is a capital asset; *Commissioner v. Ray, supra.* Payments received for the relinquishment of an exclusive right to use another's patent have been treated as capital gain; *United States v. Dresser Industries, Inc., supra.* In *Ferrer* the taxpayer was granted, by the author of a novel, the sole and exclusive right to produce and present a play based upon the novel, as well as the power to prevent the author's disposition of the motion picture rights. Both of these rights carried the requisite property genes and were accorded capital asset status.

Capital asset status is denied, however, to a contract right, not associated with an interest in specific property, to earn income in the future. Payments received upon the cancellation of an employment or management contract, for example, are considered a substitute for income which would have been earned in the future and are accordingly taxed as ordinary income. In *Eidson* the taxpayers had a management contract with an insurance company whereby they had exclusive rights to solicit

new business and to employ agents. Upon the sale of these rights, the Fifth Circuit determined that the proceeds represented the present cash value of what would otherwise have been ordinary income during the balance of the life of the contract and, therefore, taxed the proceeds as ordinary income. Accord *Hyatt v. Commissioner, supra; United States v. Woolsey, supra.* The *Holt* case, decided by the Ninth Circuit, involved a taxpayer who had a contract with Paramount Picture Corp., under which the taxpayer was to produce a number of motion pictures in return for a flat production fee for each picture plus a percentage of the gross receipts from each picture. After the production of nine motion pictures but prior to the commencement of the last two pictures to be produced under the contract, Paramount decided to terminate the contract. In consideration of the taxpayer's release of his rights to a percentage of the gross receipts due or to become due under the contract, Paramount agreed to pay a flat sum of $153,000. Under those circumstances the Ninth Circuit agreed with our holding that the taxpayer's right to participate in the gross receipts was compensation for services rendered or to be rendered under the contract and accordingly characterized the $153,000 as ordinary income.

Applying the principles set forth in the above cases to the facts of this case, we find that petitioner's rights under the operating agreement constituted property within the meaning of sections 1221 and 1231. We agree with petitioner that the operating agreement was in substance a lease rather than an employment contract. In arriving at this conclusion we have considered the following factors:

(1) Under the operating agreement petitioner was granted the sole and exclusive right to conduct the cardroom business on premises owned by Sekyra. We view the sole and exclusive right to conduct the business on the premises as tantamount to the use and possession of the premises. Use and possession are property rights normally transferred by a lease and not by an employment contract.

(2) Under the operating agreement petitioner was granted the sole and exclusive right to conduct the business. In a typical employer-employee relationship the employer has some element of control over the employee. *Freese v. United States,* 455 F. 2d 1146 (10th Cir. 1972), cert. denied 409 U.S. 879 (1972). Here,

Sekyra retained no element of control over petitioner or over the business. '

(3) Petitioner was granted an unqualified option to renew the agreement for two additional 5-year terms. While renewal options are typically granted to lessees, they are not ordinarily granted to an employee under an employment contract.

(4) The operating agreement was to terminate upon petitioner's death but not upon Sekyra's death. Since the cardroom license would expire on Sekyra's death, petitioner's rights to occupy and use the premises after Sekyra's death indicate that Sekyra was leasing the premises and not merely hiring an employee to manage the cardroom.

(5) The operating agreement gave petitioner the right to retain all gross receipts after payment of a fixed monthly fee to Sekyra.[8] Petitioner was, therefore, not guaranteed any salary or remuneration. Sekyra, on the other hand, was guaranteed a fixed monthly payment. This arrangement meant that petitioner and not Sekyra would realize any losses incurred in the operation of the club. Petitioner was under no obligation to submit financial reports to Sekyra. Sekyra's only right under the agreement was to receive the specified monthly payment. These financial arrangements more nearly resemble those found in a lease than those found in an employment contract.

(6) Pursuant to article V of the operating agreement petitioner made a lump-sum payment of $7,500 to Sekyra in exchange for his rights under the agreement.[9] While such payments are

---

[8] Although the written operating agreement specifically fixes the monthly payments at $2,000, respondent argues that the parties, in fact, agreed that the payments would increase as the profits increased. In advancing this argument, respondent relies on testimony given by Sekyra to the effect that petitioner was obligated under an oral agreement to increase the monthly payments as the profits increased. Sekyra's testimony, however, was confused and not very specific. She could not recall when the oral agreement occurred or even whether it occurred before or after the written agreement was signed. Furthermore, all of Sekyra's testimony left the impression that she believed a decision favorable to petitioner in this case would somehow have an adverse effect on her right to retain the cardroom license and continue to operate the club. Our finding that petitioner was not obligated to increase the monthly payments is based upon: (1) The written agreement; (2) petitioner's denial that any such oral agreement occurred; and (3) the absence of any satisfactory explanation as to why an agreement to share the profits would not have been reduced to writing. In light of the club's financial success and because the club's continued operation as a cardroom depended upon Sekyra's willingness to renew the license each year, we do not find it surprising that petitioner periodically agreed to increase the monthly payments.

[9] Although the $7,500 payment was stipulated, respondent attempted to establish at trial that this transfer of funds constituted a loan. The only evidence to that effect is Sekyra's testimony that the payment was a loan. But she could not recall having signed a note nor could she recall the terms of repayment. No note was introduced as evidence nor is

typically made by a tenant pursuant to a lease agreement, they are not ordinarily made by an employee in exchange for rights under an employment contract.

We recognize that the written agreement between petitioner and Sekyra included language more indicative of an employment or management contract than of a lease. In fact, the agreement specifically states, "[Sekyra] does hereby hire [petitioner] * * *. [Petitioner] does hereby accept said management." We are of the opinion, however, that the parties intentionally used these words and avoided the terminology ordinarily found in a lease in an attempt to disguise the true nature of their agreement. Both were aware that a written agreement specifically indicating that Sekyra was leasing the cardroom to petitioner would result in the revocation of the license by county officials. Prior to entering into the operating agreement petitioner and Sekyra met with an attorney, Karl G. Kappel, for the purpose of relating to him their intentions regarding the Pass Club so that he could draft a document reflecting their agreement. Kappel's understanding was that the parties intended to effect a lease. In drafting the document, however, Kappel used words more indicative of an employment contract than of a lease in an attempt to "hang a horse sign on this cow." He was endeavoring, in other words, to draft an agreement creating a lease but which would appear to be merely an employment contract. He believed that the agreement drafted in this manner would comply with the intent of the parties without creating an obvious violation of county ordinances. We recognize the substance of this agreement rather than its form and characterize it as a lease. Petitioner's rights as lessee constitute property within the meaning of sections 1221 and 1231, *Commissioner v. Golonsky, supra; Commissioner v. Ray, supra; Commissioner v. Ferrer, supra.*

We are not persuaded that we should reach a contrary result merely because the settlement payments were computed as a percentage of the gross receipts realized from the operation of the club. Respondent believes that this fact indicates that the settlement payments were intended to compensate petitioner for what

there any indication in the record that payments have been made on the purported loan. No mention was made in the settlement agreement of payments due on a loan. Again, we found Sekyra's testimony confused. We further believe that testimony was tainted by a belief on her part that the cardroom license might yet be revoked by county officials based upon a finding by this Court that she had leased the cardroom to petitioner.

he would have earned had he continued to operate the club. Thus, respondent concludes that the settlement payments were a substitute for what would otherwise have been received at a future time as ordinary income, and that they should be taxed as ordinary income under the holding of *Commissioner v. P. G. Lake, Inc., supra.* We do not agree with respondent's conclusion. As we said in *Harry F. Guggenheim,* 46 T.C. 559, 569 (1966):

> We do not believe that the rationale of *Lake* is applicable to the present case. Simply because the property transferred will produce ordinary income, and such income is a major factor in determining the value of the property, does not necessarily mean that the amount received for the property is essentially a lump-sum substitute for ordinary income. See, *United States v. Dresser Industries, Inc.,* 324 F. 2d 56 (C.A. 5, 1963); *Commissioner v. Ferrer,* 304 F. 2d 125 (C.A. 2, 1962), reversing in part 35 T.C. 617 (1961); *Metropolitan Building Co.,* 31 T.C. 971 (1959), acq. 1959-2 C.B. 6, reversed in part 282 F. 2d 592 (C.A. 9, 1960); Surrey, "Definitional Problems in Capital Gains Taxation," 69 Harv.L.Rev. 985 (1956).

We pointed out in *Guggenheim* that in ascertaining whether a capital asset has been transferred (as opposed to an income interest) it is important to determine whether the risks associated with the holding of the asset have been transferred. Under the operating agreement petitioner retained all the profits and was subject to the risk of all losses incurred in the operation of the club. Sekyra, on the other hand, received payment regardless of whether there were profits. Under the settlement agreement, however, petitioner received a percentage of the gross receipts regardless of whether the club generated a profit and Sekyra became subject to the risk of incurring operating losses. We believe there was a transfer of the underlying investment risk and not merely a transfer of an income interest.

Having concluded that petitioner's rights under the operating agreement were essentially those of a lessee and that these rights constituted property for purposes of section 1231, we must decide whether the transfer of these rights otherwise qualifies for capital gain treatment under section 1231. There is no question but that the holding period requirement has been met and that the lease was property used in petitioner's trade or business. Furthermore, the lease was subject to the allowance for depreciation. Beginning with his 1962 return, petitioner amortized the $7,500 cost of acquiring the leasehold consistent with section 1.162-11(a), Income Tax Regs. Petitioner also amortized the cost of purchased equipment and improvements made to the leased

property pursuant to section 1.162-11(b), Income Tax Regs. Respondent audited petitioner's 1963 return and the amortization deductions were not disallowed. Items which are amortizable are of a character subject to depreciation as required under section 1231(b). *Estate of John F. Shea,* 57 T.C. 15 (1971).

Finally, we must decide whether the termination of petitioner's rights was a sale or exchange. While there are cases holding that the cancellation or termination of contract rights is not a sale or exchange, *Holt v. Commissioner, supra; Leh v. Commissioner,* 260 F. 2d 489 (9th Cir. 1958), affg. 27 T.C. 892 (1957); *Commissioner v. Starr Bros.,* 204 F. 2d 673 (2d Cir. 1953), revg. 18 T.C. 149 (1952); we are not bound by these decisions in this instance. We have found that in substance the operating agreement granted petitioner a lease and that the settlement agreement effected a cancellation of that lease. Section 1241 provides, "Amounts received by a lessee for the cancellation of a lease * * * shall be considered as amounts received in exchange for such lease." The payments received by petitioner pursuant to the settlement agreement fall within section 1241 and are, therefore, deemed to be in exchange for his rights under the operating agreement. Having met all the requirements under section 1231, petitioner is entitled to treat the gain realized upon the termination of the operating agreement as capital gain.

Respondent argues that even if we find a sale or exchange of section 1231 property, a portion of the payments received in 1966 pursuant to the settlement agreement constitutes ordinary income. Respondent points to the fact that petitioner claimed a loss deduction in 1965 equal to his remaining basis in the leasehold and various improvements, which loss was recovered by way of the settlement payments received in 1966. Respondent maintains that since the loss deduction reduced petitioner's taxable ordinary income for 1965 that portion of the settlement payments received in 1966, equal to the prior deduction, constituted a recovery of the loss and should be treated as ordinary income under *First National Bank of Lawrence County,* 16 T.C. 147 (1951). Our decision in that case was based upon the accounting principle, sometimes referred to as the tax benefit rule, under which amounts deducted from income in one year must be included in income if recovered in a later year. That principle is not applicable, however, where the initial deduction

was improper. *Adolph B. Canelo III,* 53 T.C. 217 (1969), affd. 447 F. 2d 484 (9th Cir. 1971); *Streckfus Steamers, Inc.,* 19 T.C. 1 (1952). In our opinion the loss claimed by petitioner in his 1965 return was improperly allowed by respondent. Petitioner's return indicated that the deduction was taken pursuant to section 1.167(a)-8(a)(4), Income Tax Regs.[10] That regulation provides, in part:

(4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition.

During 1965, however, petitioner never intended to abandon the leasehold, at least not in the sense of irrevocably discarding it so that it could not become the subject of a sale, exchange, or other disposition by him. In fact, at the time petitioner vacated the premises, in November 1965, he was actively negotiating with Sekyra for a cash payment in exchange for his rights as a lessee. These negotiations continued until the settlement agreement was reached in January 1966. Under these circumstances petitioner was not entitled to a loss deduction in 1965. Since the deduction was improper, respondent's reliance upon the so-called tax benefit rule for purposes of characterizing a subsequent recovery of the loss as ordinary income is inappropriate.

In this regard, we note that petitioner reported the full amount of the payments received in 1966 (less selling expenses) as gain. Respondent has invoked the tax benefit rule, therefore, not to increase the amount of petitioner's income in 1966, but merely to characterize a portion of it as ordinary income rather than capital gain. In our view there is a more direct way in which a portion of the payments received in 1966 can be characterized as ordinary income.

Section 1245[11] provides that the gain realized upon a

---

[10] Sec. 1.165-2(c), Income Tax Regs., provides:

(c) *Cross references.* For the allowance under section 165(a) of losses arising from the permanent withdrawal of depreciable property from use in the trade or business or in the production of income, see § 1.167(a)-8. [T.D. 6445, 1-15-60.]

[11] SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—

(1) ORDINARY INCOME.—Except as otherwise provided in this section, if section 1245

disposition of depreciable personal property shall be treated as ordinary income to the extent of the depreciation previously allowed in respect of the property. Petitioner's rights under the operating agreement, which we have characterized as a lease, included: (1) Use and possession of the land and building; (2) use and possession of certain personal property located on the premises; and (3) use of the cardroom license. The latter two rights constitute section 1245 property as defined in section 1245(a)(3) and section 1.1245-3,[12] Income Tax Regs.

property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of—

    (A) the recomputed basis of the property, or

    (B) (i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

        (ii) in the case of any other disposition, the fair market value of such property,

exceeds the adjusted basis of such property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. Such gain shall be recognized notwithstanding any other provision of this subtitle.

    (2) RECOMPUTED BASIS.—For purposes of this section the term "recomputed basis" means—

        (A) with respect to any property referred to in paragraph (3)(A) or (B), its adjusted basis recomputed by adding thereto all adjustments, attributable to periods after December 31, 1961,
        * * *

reflected in such adjusted basis on account of deductions (whether in respect of the same or other property) allowed or allowable to the taxpayer or to any other person for depreciation, or for amortization under section 168, 169, 184, 185, 187, or 188. For purposes of the preceding sentence, if the taxpayer can establish by adequate records or other sufficient evidence that the amount allowed for depreciation, or for amortization under section 168, 169, 184, 185, 187, or 188, for any period was less than the amount allowable, the amount added for such period shall be the amount allowed.

    (3) SECTION 1245 PROPERTY.—For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either—

        (A) personal property,

[12] Sec. 1.1245-3 Definition of section 1245 property.

    (a) *In general.* (1) The term "section 1245 property" means any property (other than livestock excluded by the effective date limitation in subparagraph (4) of this paragraph) which is or has been property of a character subject to the allowance for depreciation provided in section 167 and which is either—

        (i) Personal property (within the meaning of paragraph (b) of this section),
        * * *

    (2) If property is section 1245 property under a subdivision of subparagraph (1) of this paragraph, a leasehold of such property is also section 1245 property under such subdivision. Thus, for example, if A owns personal property which is section 1245 property under subparagraph (1)(i) of this paragraph, and if A leases the personal property to B, B's leasehold is also section 1245 property under such provision. For a further example, if C owns and leases to D for a single lump-sum payment of $100,000 property consisting of land and a fully equipped factory building thereon, and if 40 percent of the fair market value of such property is properly allocable to section 1245 property, then 40 percent of D's leasehold is also section 1245 property. A leasehold of land is not section 1245 property.
    * * *

In the case of a lease of both section 1245 property and non-section 1245 property, the regulations require a determination of their respective market values at the beginning of the lease in order to determine what percentage of the leasehold constitutes section 1245 property. As no evidence has been presented in this regard, we leave that determination for the Rule 155 computation. In order to determine how much of the amount realized, upon disposition of the lease, is in respect of section 1245 property, the regulations require that the sales proceeds be allocated between section 1245 property and non-section 1245 property in proportion to their respective fair market values. This allocation must also be left for the Rule 155 computation.

Petitioner's right to the use and possession of the land and building constituted section 1250 property. Sec. 1250(c) and sec. 1.1250-1(e)(3), Income Tax Regs. Under section 1250, only "additional depreciation" is recaptured. Section 1250(b)(1) defines "additional depreciation" thusly:

> (b) ADDITIONAL DEPRECIATION DEFINED.—For purposes of this section—
>   (1) IN GENERAL.—The term "additional depreciation" means, in the case of any property, the depreciation adjustments in respect of such property; except that, in the case of property held more than one year, it means such adjustments only to the extent that they exceed the amount of the depreciation adjustments which would have resulted if such adjustments had been determined for each taxable year under the straight line method of adjustment. For purposes of the preceding sentence, if a useful life (or salvage value) was used in determining the amount allowed as a deduction for any taxable year, such life (or value) shall be used in determining the depreciation adjustments which would have resulted for such year under the straight line method.

Petitioner held the property for more than 1 year and used the straight line method of depreciation. Consequently, there is no "additional depreciation" to be recaptured.

## 2. Self-Employment Income

Respondent determined that the payments received by petitioner under the settlement agreement constituted net earnings from self-employment under section 1402 and

---

(b) *Personal property defined.* The term "personal property" means—
  (1) Tangible personal property (as defined in paragraph (c) of § 1.48-1, relating to the definition of "section 38 property" for purposes of the investment credit), and
  (2) Intangible personal property.

accordingly increased petitioner's self-employment tax under section 1401 for 1966, 1967, and 1968. This determination was based upon respondent's conclusion that the settlement payments were taxable as ordinary income. As we have determined that the settlement payments are taxable as capital gain, they do not constitute net earnings from self-employment. Sec. 1402(a)(3)(A).

### 3. Promissory Note

The settlement agreement required Sekyra to pay petitioner the specified amount of $14,000 in addition to the percentage payments. In 1966 Sekyra paid petitioner $4,000 in cash and delivered to petitioner a negotiable promissory note in the principal amount of $10,000. She paid $7,000 of the principal amount in 1966 and the $3,000 balance in 1967.

Respondent determined that the principal amount of $10,000 was includable in petitioner's income in 1966. Petitioner contends that only the $7,000 paid on the note in 1966 is includable in that year, and that the remaining $3,000 is income in 1967.

It is well established that a taxpayer must include in income, for the year of receipt, the fair market value of a negotiable promissory note of a responsible and solvent maker. *Scharf's Estate v. Commissioner,* 316 F. 2d 625 (7th Cir. 1963), affg. 38 T.C. 15 (1962); *Harry Leland Barnsley,* 31 T.C. 1260 (1959). Petitioner has introduced no evidence to contradict respondent's determination that the fair market value of his note was equal to its face amount. We must, therefore, agree with respondent's determination that the full amount of the note is income in 1966. *Aaron W. Wolfson,* 1 B.T.A. 538 (1925).

### 4. Commission Income

Respondent determined that petitioner realized Commission income in 1966 in the amount of $2,042, which was not reported on his return. Respondent's determination is presumptively correct. Rule 142(a), Tax Court Rules of Practice and Procedure. As petitioner has introduced no evidence to refute respondent's determination, we uphold that determination.

### 5. *Imputed Interest*

The parties have agreed that if we should find the settlement payments were received in exchange for section 1231 property, a computation must be made under section 483 to determine the amount which is deemed interest income. This is a matter for the Rule 155 computation.

*Decision will be entered under Rule 155.*