T.C. Memo. 2010-282

UNITED STATES TAX COURT

EDWARD AND ODETTE DAOUD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12070-04.                    Filed December 22, 2010.

<u>Joseph E. Mudd</u>, for petitioners.

<u>Laura A. McKenna</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  The Daouds owned two Wienerschnitzel
franchises in Southern California, both of which gobbled up
unusually large amounts of money.  These expenses grabbed the
Commissioner's attention and during his audit of the Daouds' 2000
and 2001 returns, he found that they had reported a large loss on
kitchen equipment they never owned, and lacked substantiation for

many of the other deductions that they claimed. The Commissioner determined a large deficiency for each year, and wants to add fraud or at least accuracy-related penalties. We make our way through the resulting menu of possibilities to determine the correct taxes and penalties.

## Background

Edward and Odette Daoud are both highly educated. Mr. Daoud has a Ph.D. in engineering and an M.B.A., and he worked as the director of engineering for Ameritech (the telecommunications company) in 2000 and part of 2001. By his own account he was business savvy. He claimed to have anticipated the downturn in the telecommunication market, causing him to look for a new job even before he was laid off in April 2001. Mrs. Daoud has a bachelor's degree in physical science and has taken classes toward a master's degree in psychology. She also managed the day-to-day operations of the couple's two Wienerschnitzel franchises in Southern California: one in Cypress and the other in Irvine.

In addition to wage and business income, the couple earned rent on a house they owned in Austin, Texas. Yet despite their many sources of income, the Daouds reported zero taxable income in both 2000 and 2001 after claiming a combination of losses and deductions. The largest of all were business expenses from their Wienerschnitzel operations. These claimed expenses reduced the

more than $1 million in combined yearly sales the restaurants produced to $22,000 of income in 2000 and a $7,000 loss in 2001. The Commissioner sent the Daouds a notice of deficiency. We tried the case in Los Angeles, where the Daouds lived when they filed their petition.

I.   The Deficiency and the Amounts at Issue

Our first task was to determine what expenses are at issue and in what amounts. This was complicated by the way the Commissioner made adjustments to the Daouds' returns, and by how Mr. Daoud prepared the returns in the first place.

According to Mr. Daoud's testimony, his wife kept the Wienerschnitzels' books on handwritten daily logs. He would then take these daily logs and transfer the information onto his Quicken software program. Once all the information was entered, he was able to use the program to generate reports. He claims that it was from his Quicken reports that he prepared the couple's tax returns.

The curious thing about this claim is that many of the amounts on the Quicken reports do not match the amounts listed on the Daouds' returns. The revenue agent nevertheless allowed the Daouds to substantiate their expenses with these Quicken reports. She made a few exceptions, but if an expense was documented on the Quicken reports, she generally allowed it--even if the amount

was greater than the Daouds reported on their returns.[1]   A consequence of allowing the Daouds amounts for certain expenses greater than those which they reported on their returns is that if they can substantiate all the expenses still in dispute, their net income would be even less than what they originally reported.

We also had difficulty determining the amounts in dispute because the revenue agent inadvertently increased the Daouds' Schedule C income by sometimes disallowing the same expense twice.  She first disallowed the expenses under an adjustment labeled "Other Expenses," which included her changes to the stores' 2000 and 2001 Schedule Cs.  She then disallowed some of the same expenses in other parts of the notice of deficiency.  We have corrected her mistakes in making our calculations and constructing our tables.

A.   <u>Schedule C Income and Deductions</u>

The following tables summarize the adjustments made to the Daouds' Schedule C income:

---

[1] From the "Explanation of Items" prepared by the revenue agent it appears that she used this examination method for both 2000 and 2001, but neither party introduced the 2001 Quicken reports into evidence.

| Summary of Cypress's Schedule C Adjustments | | | | |
|---|---|---|---|---|
| | **2000** | | **2001** | |
| | **Per Return** | **Per IRS** | **Per Return** | **Per IRS** |
| Net gross receipts | $648,071 | $647,462 | $664,827 | $664,820 |
| COGS | 336,998 | 316,090 | 320,996 | 320,996 |
| Advertising | 38,885 | 38,885 | 39,890 | 39,890 |
| Car & truck | 14,719 | -0- | 5,317 | -0- |
| Commissions/fees | 32,404 | 32,404 | 33,241 | 33,241 |
| Depreciation | 9,018 | -0- | 6,482 | -0- |
| Insurance | 4,633 | 2,314 | 4,994 | 1,875 |
| Mortgage interest | 10,029 | -0- | 5,324 | -0- |
| Other interest | -0- | 2,067[1] | --- | --- |
| Legal & professional fees | 3,965 | -0- | 5,880 | -0- |
| Pension/profit sharing | --- | --- | 2,250 | -0- |
| Office expenses | 14,309 | -0- | 17,692 | -0- |
| Rent or lease: Auto, machine & equipment | 11,075 | -0- | 21,075 | -0- |
| Rent or lease: Other business property | 71,308 | 73,957 | 88,640 | 72,000 |
| Repairs & maintenance | 6,706 | 3,072 | 16,451 | 975 |
| Supplies | 7,692 | 15,736 | 2,307 | 833 |
| Taxes & licenses | 25,829 | 5,088 | 27,581 | 25 |
| Travel | 6,710 | -0- | 3,238 | -0- |
| Meals & entertainment | 1,752 | -0- | 1,383 | -0- |
| Utilities | 24,019 | 18,980[2] | 24,201 | 24,201 |
| Charitable contributions | 3,189 | -0- | 3,890 | -0- |
| Contracted services | 2,360 | 2,701 | 2,418 | 2,433 |
| Laundry | 490 | -0- | 583 | -0- |
| Pest control | 480 | -0- | 600 | 504 |
| Trash | 2,194 | 2,045 | 2,183 | 2,320 |
| Uniforms | 1,604 | 727 | 2,116 | 1,310 |
| **Total net income** | **17,703** | **133,396** | **26,095** | **164,217** |

[1] The Daouds incorrectly categorized "Other interest" as "Mortgage interest." The Commissioner disallowed this entire amount--it wasn't interest on a mortgage--but then allowed the amount the Daouds could substantiate as "Other interest."

[2] The Commissioner at first gave the Daouds an increased deduction for utilities of $27,252 but then reduced it by $8,372.

| Summary of Irvine's Schedule C Adjustments | | | | |
|---|---|---|---|---|
| | 2000 | | 2001 | |
| | Per Return | Per IRS | Per Return | Per IRS |
| Net gross receipts | $464,856 | $463,401 | $431,320 | $431,320 |
| COGS | 260,352 | 258,102[1] | 250,825 | 250,825 |
| Advertising | 27,892 | 27,905 | 26,047 | 26,047 |
| Car & truck | 12,951 | 1,201 | 15,586 | -0- |
| Commissions/fees | 23,243 | 23,251 | 21,566 | 21,566 |
| Depreciation | 1,882 | -0- | 1,466 | -0- |
| Insurance | 1,222 | 2,614 | 1,222 | 1,222 |
| Mortgage interest | 4,465 | -0- | 3,220 | -0- |
| Other interest | --- | --- | --- | --- |
| Legal & professional fees | 2,760 | -0- | 2,988 | -0- |
| Office expenses | 5,614 | 4,918 | 3,938 | -0- |
| Rent or lease: Auto, machine & equipment | 9,744 | 1,980 | 2,794 | -0- |
| Rent or lease: Other business property | 46,879 | 50,532 | 72,000 | 72,000 |
| Repairs & maintenance | 4,286 | 990 | 5,065 | 1,000 |
| Supplies | --- | --- | 1,625 | -0- |
| Taxes & licenses | 30,483 | 2,497 | 26,915 | -0- |
| Travel | 2,072 | -0- | 1,989 | -0- |
| Meals & entertainment | --- | --- | 1,172 | -0- |
| Utilities | 19,681 | 20,362 | 19,782 | 19,782 |
| Charitable contributions | 1,960 | -0- | 788 | -0- |
| Contracted services | 931 | -0- | 1,932 | -0- |
| Laundry | 490 | -0- | 490 | -0- |
| Pest control | 438 | -0- | 458 | 458 |
| Trash | 1,492 | 1,260 | 1,512 | 1,408 |
| Uniforms | 1,524 | -0- | 1,689 | 88 |
| Misc. materials | -0- | 10,053 | -0- | 827 |
| **Total net income** | **4,495** | **57,736** | **(33,749)** | **36,097** |

[1] The Commissioner at first increased Irvine's COGS by $304, but then adjusted it downward by $2,590.  The net amount is listed.

| Total Schedule C Adjustments | | | |
|---|---|---|---|
| Cypress | | Irvine | |
| 2000 | 2001 | 2000 | 2001 |
| $115,693 | $138,122 | $53,241 | $69,846 |

The parties compromised or conceded some of these adjustments. What's left for us to decide are the following amounts (in each instance the difference between the parties' final positions):

| Schedule C Expenses Still at Issue | | | | |
|---|---|---|---|---|
| | Cypress | | Irvine | |
| | 2000 | 2001 | 2000 | 2001 |
| Cost of goods sold | $20,908 | --- | $2,250 | --- |
| Car & truck | 14,719 | $5,317 | 11,750 | $15,586 |
| Depreciation | 9,018 | 6,482 | 1,882 | 1,466 |
| Insurance | 2,319 | 3,119 | --- | --- |
| Mortgage interest & other interest | 7,962 | 5,324 | 4,465 | 3,220 |
| Legal & professional services | 3,965 | 5,880 | 2,760 | 2,988 |
| Pension/profit sharing | --- | 2,250 | --- | --- |
| Office expenses | 14,309 | 17,692 | 696 | 3,938 |
| Rent or lease: Auto, machine & equipment | 11,075 | 21,075 | 7,764 | 2,794 |
| Rent or lease: Other business property | --- | 16,640 | --- | --- |
| Repairs & maintenance | 3,634 | 15,476 | 3,296 | 4,065 |
| Supplies | --- | 1,474 | --- | 1,625 |
| Taxes/licenses | 20,741 | 27,556 | 27,986 | 26,915 |
| Travel | 6,710 | 3,238 | 2,072 | 1,989 |
| Meals & entertainment | 1,752 | 1,383 | --- | 1,172 |
| Utilities | 5,039 | --- | --- | --- |
| Contracted services | --- | --- | 931 | 1,932 |
| Laundry | 490 | 583 | 490 | 490 |
| Pest control | 480 | 96 | 438 | --- |
| Trash collection | 149 | --- | 232 | 104 |
| Uniforms | 877 | 806 | 1,524 | 1,601 |
| Total | 124,147 | 134,391 | 68,536 | 69,885 |

The parties did stipulate that the Daouds are not entitled to any of the deductions claimed for charitable contributions.

B. Schedule A Deductions

The Commissioner challenged two of the Daouds' Schedule A deductions from 2000: $3,640 in claimed gift/jewelry expenses and $10,183 for mileage. The Daouds conceded after trial that they aren't entitled to any Schedule A deductions beyond those already

allowed by the Commissioner, but they are still relevant for our determination of penalties. The Daouds also concede that they failed to report a $2,565 state-income-tax refund received in 2000. The Daouds were required to include this amount because their 1999 Schedule A claimed a deduction for all of the state income taxes paid, including the amount that they overpaid.

C.   Gain on the Sale of the Irvine Wienerschnitzel

In the notice of deficiency, the Commissioner adopted the calculations of the revenue agent and determined that there was unreported gain realized on the sale of the Irvine business in 2001. The Daouds purchased the Irvine Wienerschnitzel in 1994 for approximately $200,000, and sold it for about $350,000. The IRS determined that the adjusted basis in the business was $236,166.55, which included the cost of improvements made by the Daouds in 2001. In addition, it was determined that the Daouds had an available net capital loss of $88,896 that could offset some of the gain realized on the sale.

Out of the $54,866 gain subject to tax, he also determined that $38,848 was ordinary income under section 1250[2] and the rest was capital gain. He arrived at these numbers by starting with the amount paid by the Daouds for the Irvine Wienerschnitzel in 1994, about $200,000, and divided it by 39 years--the recovery

---

[2]   Unless otherwise noted, all section references are to the Internal Revenue Code; all Rule references are to the Tax Court Rules of Practice and Procedure.

period for nonresidential real property under section 168. From that calculation he concluded that the depreciation allowed per year under a straight-line method was $5,128. He then multiplied $5,128 by the number of years the Daouds owned the Irvine franchise, coming to $38,848. Because $38,848 was found to be "section 1250 income,"[3] he presumed that the remaining $16,018 was capital gain. Eventually the parties agreed that the Daouds realized only a $12,325 capital gain, but the Commissioner's determination of section 1250 income is still at issue.

D.   Penalties

On their 2000 return, the Daouds reported a $110,015 loss on the sale of kitchen equipment. As a result, the revenue agent requested documentation from the Daouds substantiating this loss; and Mr. Daoud gave the agent a document titled "CONTRACT" that was written on SILVA/MBA II Restaurant Equipment letterhead. The document was a bid from SILVA listing new equipment and equipment upgrades that the Daouds would have to buy before they could sell the Irvine Wienerschnitzel. The total amount of SILVA's bid was $110,015.

When the revenue agent received the bid she noticed a couple of odd things about it. The document was signed by Edward Daoud but the line for Michael Freed, one of the contractor's partners,

---

[3] The terms "section 1250 gain," "section 1250 recapture," and "section 1250 income" refer to the amount of ordinary income required to be recognized under section 1250.

was blank.  It also appeared as though the date on the document had been altered to read March 1, 2000.  Her suspicions prompted her to issue a summons to SILVA.  SILVA quickly sent her a list of bids it had made for the Daouds' Irvine Wienerschnitzel, and three canceled checks totaling $31,241 written by the Daouds.  One of the bids on the list was for $110,015 and was made on March 1, 2001.  From this the revenue agent determined that the document provided by Mr. Daoud had been altered, causing her to disallow the kitchen-equipment loss and apply a civil-fraud penalty under section 6663 for the amount of the deficiency attributable to the kitchen equipment loss, and accuracy-related penalties under section 6662 for the rest.

At the end of trial, however, the Commissioner orally moved under Rule 41(b) to conform the pleadings to the evidence presented.  He now wants us to attach the civil-fraud penalty to the full amount of the underpayment for both tax years.  And, as an alternative, he asks us at least to apply the accuracy-related penalty under section 6662 to whatever amount we determine is not subject to the civil-fraud penalty.  The Daouds did not object to the Commissioner's motion, and both parties have specifically addressed the merits of the issue in their briefs.

## II.  The Trial

The Daouds were unable to substantiate many of their deductions at trial, and Mr. Daoud's testimony did not help their case.  Mr. Daoud conceded that he and his wife were not entitled

to the loss on the sale of kitchen equipment, but he tried to explain why he reported a loss for equipment he had neither bought nor sold. He testified that he was unsure how the $110,015 loss got on his return, but he speculated that the bid was mixed up with all the other paperwork on his desk, which caused him to enter it into Turbo Tax by mistake. He also testified that the date he recorded on the Form 4797, Sales of Business Property, as the date that he sold the equipment was simply one that he chose at random after Turbo Tax prompted him to enter a date. He went on to explain that he gave the altered document to the revenue agent "out of panic."

During the remainder of Mr. Daoud's direct examination, he proffered numerous bits of evidence and explained how each piece substantiated the Daouds' deductions and expenses. One of these exhibits included two mileage logs and various receipts from airline, hotel, and car rental companies. Mr. Daoud offered this exhibit to substantiate the travel-expense deductions he claimed for his job search and for the Wienerschnitzel restaurants.

The two mileage logs--especially the dates on them--are particularly interesting. On the first entry of the first log, Mr. Daoud filled in 1/7/00 for the date, wrote his destination, the business purpose, and the miles driven. The log continues sequentially until 12/18 when just the day and month are noted. On the second log the dates start over with 1/5/00 and the log again continues sequentially with just the day and month written

from 1/9 until 11/27.  Some of the dates appear twice and others do not.  The Commissioner's counsel wondered why Mr. Daoud had two logs for the same year, and during the cross-examination she asked him:

Q    Are they all for 2000, or could you explain that
     to us?

A    It looks like both of them are for 2000.

        *     *     *     *     *     *     *

Q    And you don't have one for 2001?

A    I may. I don't really know.

During the next part of her cross-examination, the Commissioner's counsel asked Mr. Daoud about his other travel expenses.  She questioned him about the dates of specific trips and the corresponding business purpose.  For each trip, Mr. Daoud explained who interviewed him or described a Wienerschnitzel function that he and his wife attended.  One of the receipts Mr. Daoud was questioned about came from a hotel in Lake Tahoe.  The receipt showed that two adults checked into a hotel on December 22, 2001, and checked out on the 26th.  Mr. Daoud explained that this trip was for a Wienerschnitzel conference.  The Commissioner's counsel found it odd and asked:

Q    Would you characterize this as a Christmas
     conference?

A    It is not really up to us when they hold it.
     It is when they hold it and we go to it.

Q    Do they typically hold Wienerschnitzel
     conferences over the Christmas holidays?

A      Occasionally, yes, they do. This is on the request of the franchisees.

The Commissioner's counsel continued asking Mr. Daoud questions about specific receipts but soon returned to the mileage logs to ask about specific dates listed. For example:

Q      And on 2/7, you went to Mission [Viejo]?

A      Yes.

Q      And who did you interview with there?

A      Another employer. I don't really remember the name.

         *      *      *      *      *      *      *

Q      On 2/16, you went to Santa Monica?

A      It looks like Santa Monica.

Q      Okay. And on 2/19 you went to Riverside?

A      Yes.

Q      And who did you interview with in Santa Monica?

A      I don't really remember.

Q      Okay. But you had an interview?

A      Yes, all these are interview related.

Q      Okay. And who did you interview with in Riverside?

A      Give me a second, please. I believe it was--I believe they are a subsidiary, and I don't remember exactly their name.

Having gotten what she wanted from Mr. Daoud, the Commissioner's counsel asked him to compare the dates on the receipts with those on the mileage logs:

Q    All right. Mr. Daoud, we have now just gone over
     some of your travel, and I am just curious. Isn't
     it true that you just testified that on February 7,
     2000, you were on an interview in Mission [Viejo]?
     Yet, you have also testified that * * * on 2/7
     * * * you were in Portland? * * *.

A    It can be.  Something in the morning and something
     in the afternoon.

Q    And so you went to both of them?

A    Possibly.

Q    Okay. Now what about how you just testified that
     on 2/14 that you were in Long Beach, and on 2/16,
     * * * were in Santa Monica, and on 2/19, you were
     in Riverside for interviews. Yet at the same time,
     you were in Korea between 2/13 and 2/19?  How can
     that be? That's quite a far distance.

          *    *    *    *    *    *    *

A    The Korea trip * * * was 2001.

          *    *    *    *    *    *    *

Q    This is your ticket to Korea, correct?

A    Yes.

Q    And if you look at the date of issue, February 9,
     2000 and not 2001, correct?

A    It looks like it.

Through further cross-examination, the Commissioner's
counsel showed that the mileage logs placed Mr. Daoud in Oxnard
on the same day he was in Toronto, in California when he was in
Illinois, at interviews in several California cities when he was
apparently in London, and in San Jose and Santa Monica when he
was shown to be in Hawaii.  Mr. Daoud then conceded that it was
possible that the mileage logs reflected two separate years, one

for 2000 and one for 2001. But even if we assume that the mileage logs cover both years, it would not explain the inconsistences between the logs and Mr. Daoud's other travel receipts. This extraordinarily effective cross-examination substantially undermined Mr. Daoud's credibility and the value of any of the evidence that he himself created.

## Discussion

### I.   The Commissioner's Motion To Amend the Pleadings

We must first decide whether to grant the Commissioner's motion to conform the pleadings to the evidence presented at trial, to let him assert a fraud penalty for both 2000 and 2001. See sec. 6214(a); Rule 41(b). Rule 41(b)(1) treats an issue as if raised in the pleadings if it was tried with the express or implied consent of the parties. See, e.g., LeFever v. Commissioner, 103 T.C. 525, 538-39 and n.16 (1994), affd. 100 F.3d 778 (10th Cir. 1996). That's what happened here. The Daouds failed to object to the Commissioner's motion at trial. The facts giving rise to the Commissioner's motion were raised during trial, and without objection. And both parties addressed the substance of whether the civil-fraud penalty should be applied to the entire 2000 and 2001 deficiency in their briefs. There's also no surprise here--the evidence on which the Commissioner bases his motion comes from Mr. Daoud's own testimony and the facts stipulated by the parties. We will

therefore grant the Commissioner's motion and allow him to assert the additional civil-fraud penalties.[4]

## II. Substantiation of the Disputed Schedule C Items

The parties dispute $192,683 of Schedule C expenses for 2000 and $204,276 for 2001. The Daouds deducted expenses in multiple categories, but we divide them into two: (1) expense categories for which the Daouds have offered no evidence, and (2) expense categories that the Daouds actually tried to substantiate. We quickly deal with those items that fall into the first category. Because the Commissioner's determination is presumed correct, without further evidence the Daouds have not met their burden of proof. See Rule 142(a). The Daouds therefore have failed to substantiate the disputed portions of the following categories of expenses: car and truck, depreciation, pensions and profit sharing plans, utilities, legal and professional fees, and laundry.

We next consider whether the Daouds have substantiated any of the remaining expenses.

### A. Cost of Goods Sold

The Commissioner says that the Daouds aren't entitled to $23,158 of their cost-of-goods-sold adjustment--the difference between the total cost of goods sold reported on the Daouds' 2000

---

[4] He of course bears the burden of proving that the penalty is warranted by clear and convincing evidence. See sec. 7454(a); Rule 142(b).

return and the corresponding amount listed on the Quicken reports.  The Daouds don't attempt to reconcile this discrepancy.  Instead they argue that the amounts they claimed were reasonable, and thus should be allowed in full.  But we don't believe that the Commissioner acted unreasonably in denying less than four percent of the Daouds' claimed cost of goods sold in 2000.  This is especially true given the fact that the revenue agent relied on the Daouds' own Quicken reports in reaching her conclusion.

The Daouds also tried to substantiate the disputed portion of the cost of goods sold with an exhibit containing page after page of photocopied receipts from grocery stores and wholesale clubs.  These receipts are of little value.  Without an explanation from the Daouds, it is impossible for us to distinguish items used at their Wienerschnitzels from those used by them personally.  Many of the items on the receipts are household or personal care products, or food and drink (e.g., liquor) that we find were probably not served or used at their restaurants.  We therefore sustain the Commissioner's cost-of-goods-sold adjustment for 2000.[5]

---

[5] The Daouds entered into evidence a number of checks written to their payroll-service company.  The Commissioner allowed the funds paid on these checks as part of cost of goods sold.  These checks do not, therefore, substantiate any of the expenses still in dispute.

B.    Insurance

The parties dispute only the Cypress restaurant's insurance expenses for 2000 and 2001.  The Commissioner did allow $2,314 of the $4,633 amount claimed for 2000, and $1,875 of the $4,994 amount claimed for 2001.  But the Daouds argue that they are entitled to the full amount and offer invoices from their insurance agent, and a policy summary from their insurance carrier.  According to these documents, the insurance premium for the Cypress Wienerschnitzel in 2001 was about $2,000.  (The Daouds introduced no evidence on their 2000 insurance expense.)  Although the $1,875 the Commissioner allowed is less than the premiums shown on the documents, the Daouds have not proven that they paid those premiums.  We therefore find in favor of the Commissioner.

C.    Mortgage and Other Interest

The parties dispute $13,286 of the mortgage-interest expense claimed for 2000 and $7,685 for 2001.  The Commissioner disallowed these expenses because the Daouds were renters, not owners, of their Wienerschnitzels' real estate.  Mr. Daoud conceded that the mortgage label wasn't proper, but said that he had just mistakenly reported as mortgage interest the interest they paid to finance their purchase of restaurant equipment.  As proof, he offered canceled checks totaling $15,807 written to a credit union in 2001.  These checks and Mr. Daoud's testimony don't prove that the payments were being made on a business, and

not a personal, loan; therefore, we find that they failed to substantiate the disputed interest expenses.

    D.    <u>Equipment Lease</u>

The Commissioner disputes equipment-lease deductions totaling $18,839 for 2000 and $23,869 for 2001. The Daouds claim that part of the 2000 equipment-lease expense was for an ice machine at their Irvine restaurant that cost $165 per month. To substantiate this expense, they introduced a leasing contract for years other than 2000 and canceled checks showing that they made their payments. These are the types of records we like to see, but the Commissioner is also correct that on this point they were superfluous--he had already allowed the ice-machine expense.[6]

The only evidence the Daouds provide to substantiate the rest of their equipment-lease expenses is a stack of canceled checks written to three different banks. As with the mortgage-interest expense, they did not provide any additional documentation to show the purpose for those checks. And our examination of the 2000 Quicken reports showed checks written to the same banks for the same amounts also showing up as "Mortgage interest expense," "Other interest expense," and "Misc. materials" and "Supplies." Such double-duty doesn't work: the

---

[6] The Daouds originally claimed $9,744 and the Commissioner allowed $1,980 ($165 x 12 months), leaving the disputed balance of $7,764.

Daouds aren't entitled to claim any of the disputed equipment-lease expenses.

E.    Lease Expense:  Other Business Property

The parties' only dispute in this category is over the expense of leasing the building and land used by the Cypress Wienerschnitzel in 2001.  The Commissioner allowed $72,000 of the $88,640 claimed.

The Daouds argue that they are entitled to a deduction for the money they paid the franchisor under a common-area maintenance contract, about $395 a month.  But the invoices offered are for the Irvine, not the Cypress, store and from 2000, not 2001.  The Daouds did not provide us with Cypress's lease or any other evidence showing Cypress's obligation to pay this amount.

We nevertheless found, buried deep within one of the Commissioner's exhibits, copies of eight checks drawn on Cypress's bank account and deposited by the building's lessor. Five checks are for $6,129.69 and three are for $6,341.73.  We find these checks substantiate eight rent payments made for eight different months in 2001.

Although the Daouds cannot fully substantiate their rental expense for the entire year, under Cohan we can approximate the allowable amount if we have a reasonable basis to do so.  Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-43 (1985).  Therefore, we will

allow the Daouds to claim $6,129.69--the lesser of the two amounts listed on the checks--for each of the four months not proven directly. This is a small victory for the Daouds: We find substantiation of $74,192.40 of their lease expenses for 2001, which comes out to be $2,192.49 more than the Commissioner allowed.

F. Repairs

The Daouds offered copies of checks to prove the disputed repair expenses of $6,930 for 2000 and $19,541 for 2001. Three of the checks were written from the Irvine Wienerschnitzel's bank account in 2000, and their total is less than the amount already allowed by the Commissioner for this category. The fourth check was written from the Daouds' personal account in 2001, and the only evidence offered to explain its purpose is Mr. Daoud's testimony that it was for repairs. We are not persuaded, and find that the Daouds have not substantiated the disputed repair expenses.

G. Supplies

Included with the receipts previously discussed are ones from Home Depot and Restaurant Depot, which the Daouds argue substantiate their deductions for supplies. During his testimony, Mr. Daoud claimed that these receipts were for restaurant supplies. We do find Mr. Daoud's claims more likely than not true for the items that he bought at Restaurant Depot, but the things he bought at Home Depot could just as likely have

been used by the Daouds at home.  The Daouds' inability to prove that these items were bought for a business purpose is not the only problem here--the total amount the Commissioner allowed the Daouds for supplies is greater than the total amount they claimed on their returns.[7]  And while $3,099 is still in dispute for 2001 ($1,474 for Cypress and $1,625 for Irvine), the Daouds have not provided any specific proof that these receipts correspond to that amount.  We again find for the Commissioner.

H.    Taxes & Licenses

The Commissioner and the Daouds continue to argue over property taxes and licensing fees.  For the Cypress store, the Commissioner allowed only $5,088 for 2000 and $25 for 2001; for the Irvine store, he allowed $2,497 for 2000 and nothing for 2001.

Even though the Daouds did not own the property their Wienerschnitzels sat on, they claim that both franchise agreements required them to pay property taxes.  If true, this would be a proper business deduction, though properly reportable as part of their rental/lease expense.  See sec. 162(a); sec. 1.162-11(a), Income Tax Regs.  But here again they produce no

---

[7] On Cypress's Schedule C for 2000, the Commissioner allowed a $15,736 deduction for "Supplies" even though the Daouds claimed only $7,692.  Nothing was claimed or allowed for Irvine in 2000. And for 2001, the Commissioner allowed $833 of Cypress's $2,307 supply expense, and zero of Irvine's $1,625 supply expense. Thus, the total deduction allowed by the Commissioner for supplies, $16,569, is $4,945 more than the total deductions taken by the Daouds on their returns.

records for the Cypress store, and so we find for the Commissioner on this issue.

The Daouds did produce invoices for real-property taxes on the Irvine store for two fiscal years: 1999-2000 and 2000-2001. The tax liabilities shown were for $4,816 and $4,894.82, respectively. They also provided records showing that their landlord billed them for the Irvine property's taxes (plus a copy of a $424 bill from the City of Orange for health-service fees).

Invoices by themselves don't prove payment. But the Closing Statement generated by Heritage Escrow Company, documenting the sale of their Irvine business in November 2001, confirms that they were current on their real-property taxes and health-service fees through the closing date. Though the documentation is sparse, we do find it more likely than not that the Daouds paid real property taxes totaling $4,856 in 2000 and $4,283 in 2001.[8] We also find it more likely than not that the Daouds paid $424 in health-service fees in 2000 and $347 in 2001. After subtracting what the Commissioner previously allowed, the Daouds are entitled to claim an additional $2,783 for 2000 and $4,630 for 2001.

### I.    Travel, Meals, and Entertainment

The Daouds argue that they are entitled to deduct $10,534 in expenses for travel to Lake Tahoe in 2000, and $7,782 for travel to Hawaii for a Wienerschnitzel conference in 2001. They showed

---

[8] Because the Daouds sold their business in November 2001, the expenses for "Taxes & Licenses" are less in 2001.

receipts from these trips and Mr. Daoud testified about the trips' business purpose. While we believe that the Wienerschnitzel organization has conferences, we do not believe Mr. Daoud's testimony that these trips were for those conferences. We need corroboration, especially given Mr. Daoud's claim that he and Mrs. Daoud were in Lake Tahoe on Christmas Day for a conference. Even if we credited his testimony on this point, section 274(d) requires enhanced substantiation for travel expenses which neither Daoud supplied. We therefore find that they are not entitled to deduct these travel expenses.

The Daouds also claim that the numerous restaurant receipts introduced into evidence were for meals with suppliers and other people related to the Wienerschnitzel business. Mr. Daoud cannot remember the specifics of the meals, but he assured us in his testimony that they were for business. This testimony also lacks the specificity that section 274(d) requires. We find that the Daouds can't deduct these meals.

J.   Other Expenses

1.   Contracted Services

To substantiate the deductions for contracted services, the Daouds offer copies of checks written to various individuals. The Daouds, however, failed to explain what the individuals did for them. The only explanation they gave is that one of the individuals was a labor contractor who helped out at their Irvine store. With only the checks and Mr. Daoud's testimony, we are

not convinced that the money was spent for a business purpose. Therefore, we will allow neither the disputed $931 for 2000 nor the disputed $1,932 for 2001.

### 2. Pest Control

The Commissioner allowed the Daouds almost $1,000 for pest-control expenses in 2001, but the parties still fight over $918 in 2000 and an extra $96 in 2001. To support their claim, the Daouds offer invoices from Lloyd Pest Control for $692 billed and dated 2001. But they don't argue that these invoices substantiate expenses disallowed by the Commissioner, nor do they offer any evidence to substantiate any 2000 expense for this category. We find for the Commissioner on this issue as well.

### 3. Trash Collection

The Commissioner allowed the Daouds most of their claimed expenses for trash collection, including an amount greater than what they claimed on their 2001 returns for their Cypress store. But the Daouds say they should still be able to deduct an extra $381 in 2000 ($149 for the Cypress store and $232 for Irvine store) and $104 in 2001 (for the Irvine store). The Daouds produced a few invoices billed to the Cypress location, but the Commissioner already allowed an amount greater than the total of the invoices. The Daouds' failure to show how the invoices prove any disputed amount forces us to toss this argument. We find that the Daouds failed to substantiate the disputed trash-collection expense.

### 4. Uniforms

The disputed uniform expenses are $2,401 for 2000 and $2,407 for 2001. To substantiate these expenses, the Daouds offer only invoices sent to their Cypress Wienerschnitzel in 2001. The invoices total $1,310, which is the exact amount the Commissioner allowed their Cypress store for that year. Because no other evidence was provided, we find that the Daouds have not substantiated the disputed portions of the uniform expense.

## III. Depreciation Recapture

The parties agree that the Daouds realized at least $12,325 of capital gain on the sale of their Irvine Wienerschnitzel in 2001, so we need to decide only if the Daouds are liable for the $38,848 of section 1250 gain.[9]

As we've already briefly noted, in calculating the Daouds' section 1250 income the Commissioner started out with the purchase price of the Irvine Wienerschnitzel in 1994

---

[9] The only argument the Daouds make to dispute their liability for section 1250 gain is that the parties agreed in the stipulation that $12,325 was the amount of gain that should have been recognized in 2001; therefore, the Commissioner is estopped from asserting any additional gain under section 1250. But the stipulation states only that the Daouds "received capital gain in 2001 from the sale of their Irvine Wienerschnitzel in the amount of $12,325 * * *." It does not stipulate to the overall gain realized on the sale. Given that this Court applies general contract principles when interpreting tax-settlement agreements, the Daouds' position is without merit. See, e.g., Dutton v. Commissioner, 122 T.C. 133, 138 (2004). Parties "are bound to the terms agreed upon and not to the premises underlying their agreement[.]" Pack v. United States, 992 F.2d 955, 959-60 (9th Cir. 1993) (citing Zaentz v. Commissioner, 90 T.C. 753, 761 (1988)).

(approximately $200,000) and divided it over 39 years--the recovery period for nonresidential real property.  See sec. 168(c).  He then calculated that the annual allowable depreciation under a straight-line method was $5,128 which, when multiplied by the years that the Daouds owned the Irvine franchise equaled $38,848.

The math works, but the reasoning is wobbly.  Section 1250 applies to real property depreciable under section 167 (i.e., used in a trade or business) other than section 1245 property. See secs. 167(a), 1250(c); sec. 1.1250-1(e)(3), Income Tax Regs. When section 1250 property is disposed of (e.g., sold or exchanged), a taxpayer generally has to recognize as ordinary income the lesser of (1) the "additional depreciation," or (2) the taxpayer's gain on the disposition of the property.  See sec. 1250(a)(1); sec. 1.1250-1(a), Income Tax Regs.  Additional depreciation--for property acquired after 1975 and held for more than one year--is usually the amount of depreciation (or amortization) claimed by the taxpayer in excess of the amount allowed under a straight-line method.[10]  Sec. 1250(b)(1); sec. 1.1250-2(a), Income Tax Regs.; see, e.g., Universal Mktg., Inc.

_____

[10] The straight-line method requires taxpayers to take depreciation deductions evenly over an asset's useful life or recovery period--roughly, the asset's cost divided by the number of years required by the Code.  See sec. 1.167(b)-1, Income Tax Regs.

v. Commissioner, T.C. Memo. 2007-305; Murry v. Commissioner, T.C. Memo. 1993-471.

"[S]ection 1250 property" is usually a building, including its structural components, owned by the taxpayer and used in his trade or business. See secs. 1245(a)(3), 1250(c); Hosp. Corp. of Am. v. Commissioner, 109 T.C. 21, 56 (1997). A leasehold interest in land or a building, which is what the Daouds held in their Irvine Wienerschnitzel, may also qualify as section 1250 property. Sec. 1250(c); sec. 1.1250-1(e)(3), Income Tax Regs.; see also Kingsbury v. Commissioner, 65 T.C. 1068, 1090 (1976). But tangible and intangible personal property used in the taxpayer's trade or business does not--it's governed by section 1245.[11] See sec. 1245(a)(3); Hosp. Corp., 109 T.C. at 56-92 (discussing the differences between section 1250 and section 1245 property).

Under section 1245, all deductions for depreciation are recouped as ordinary income to the extent a taxpayer realizes a corresponding gain on the disposition of his section 1245 property.[12] See e.g., sec. 1245(a); Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 445 (1980). Like section 1250, section 1245 only applies when a gain is realized. The key

_____

[11] Section 1245 also includes some real property used in mining, manufacturing, and certain service industries. See sec. 1245(a)(3)(B)-(C).

[12] See section 1245(b) for the exceptions and limitations.

distinction between the two sections is that section 1245 recaptures all depreciation deductions affecting the adjusted basis of the property, and section 1250 only recovers "additional depreciation."

Because the Code treats section 1250 and section 1245 property differently, the regulations require gain to be computed separately for each type of property. See secs. 1.1245-1(a)(5), 1.1250-1(a)(6), Income Tax Regs.; Kingsbury, 65 T.C. at 1090. Section 1.1245-1(a)(5), Income Tax Regs., states:

> In case of a sale, exchange, or involuntary conversion of section 1245 and nonsection 1245 property in one transaction, the total amount realized upon the disposition shall be allocated between the section 1245 property and the nonsection 1245 property in proportion to their respective fair market values. * * *

The recapture rules for section 1245 are also usually applied on an asset-by-asset basis. See sec. 1.1245-1(a)(4), Income Tax Regs.; Buffalo Tool & Die, 74 T.C. at 445-52; cf. sec. 1.1250-5 (d)(2)(iii), Income Tax Regs.

In this case, the Commissioner incorrectly assumed that the Irvine Wienerschnitzel was composed of only section 1250 property. This is evident from the fact that his agent took the aggregate value of the business property in 1994 (i.e., the purchase price), and divided it by a recovery period used only for section 1250 property. But the restaurant was already there in 1994, leading us to find that the Daouds had bought both section 1250 and section 1245 property. Certainly by 2001, much

of the Irvine franchise's property fell under section 1245 (e.g.,
franchise rights, machines, equipment, and purchased goodwill).

The Commissioner also confused the application of section
1250 with section 1245.  The Commissioner added to the Daouds'
ordinary income the sum of all the depreciation that was
calculated under a straight-line method, for the period in which
they owned the business.  This is not right:  Section 1250 gain
is realized only if the Daouds took more than a straight-line-
depreciation deduction.  See sec. 1250; sec. 1.1250-1, Income Tax
Regs.

There is no evidence in the record that suggests the Daouds
used anything other than a straight-line method when depreciating
and amortizing their business's 1250 property.  The Daouds paid
rent in equal, monthly installments for the use of the land and
building, and it appears that they claimed depreciation
deductions on their Schedule Cs only for section 1245 property.[13]
We therefore find that the Daouds are not required to recognize
any recapture income under section 1250.

The question of recapture under section 1245 is a bit more
complicated.  We have consistently held that we will not consider
"issues" which have not been pleaded, see, e.g., Markwardt v.
Commissioner, 64 T.C. 989, 997 (1975); Troutman v. Commissioner,

---

[13] The Daouds never depreciated their 2001 improvements,
which may or may not qualify as 1250 property.  See sec. 1250(c);
sec. 1.48-1(e), Income Tax Regs.; Walgreen Co. v. Commissioner,
68 F.3d 1006, 1007 (7th Cir. 1995), revg. 103 T.C. 582 (1994).

T.C. Memo. 2004-32, affd. 137 Fed. Appx. 70 (9th Cir. 2005), but we can sustain the Commissioner's determination for "reasons" other than those given in the notice of deficiency, e.g., <u>Estate of Finder v. Commissioner</u>, 37 T.C. 411, 423 (1961).  What distinguishes "issues" from "reasons" is that a new issue would alter the evidence presented, but a new reason is just a new argument about the existing evidence.  See, e.g., <u>Hurst v. Commissioner</u>, 124 T.C. 16, 30 (2005).

The Commissioner neither argued nor determined that a part of the Daouds' deficiency stemmed from section 1245 recapture, and this is not a case where the Commissioner used the right rules but labeled it with the wrong section number.  Under section 1245, the Commissioner's determination would still be amiss.[14]  We therefore find that Daouds were not put on notice of the section 1245 argument, and did not know to present evidence or arguments addressing it.

---

[14] The Daouds did in fact sell some section 1250 property as part of the sale of their business--for example, their leasehold interest in the land and building, and possibly some of the leasehold improvements that they had made.  This means that some of their adjusted basis and sale proceeds would still need to be allocated between section 1245 and section 1250 property.  This the revenue agent did not do.  Even then, the 39-year recovery period would not apply.  Intangibles such as purchased goodwill and the right to operate a franchise all have a 15-year depreciation recovery period.  Sec. 197.  And the Daouds' equipment and other section 1245 property that they sold would likely be recoverable over 5 and 15 years.  See sec. 168.  Thus, we can't consider the $38,848 amount merely wearing the wrong label to be a reasonable estimate of the section 1245 gain.

Neither party litigated the issue of section 1245 gain. Neither party tried to value the business's section 1245 property, and neither offered any valuation of the Daouds' section 1245 property. We therefore find in the Daouds' favor on any issue of section 1245 income.

IV. Penalties

A. Fraud Penalties

Section 6663(a) imposes a penalty of "an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." A taxpayer commits fraud when he "evade[s] taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." Parks v. Commissioner, 94 T.C. 654, 661 (1990). The Commissioner has conceded that Mrs. Daoud is not liable for the fraud penalty and we must determine only Mr. Daoud's liability.

To impose a penalty for fraud we must find that the Commissioner has proven by clear and convincing evidence that (1) an underpayment of taxes occurred, and (2) that some portion of the underpayment was due to fraud. See sec. 6663(a); Rule 142(b). It is the second element that is often difficult for the Commissioner to prove because he likely does not have direct proof of the taxpayer's intent. This is why we allow the Commissioner to prove fraud with "circumstantial evidence and reasonable inferences drawn from the facts * * *." Meier v. Commissioner, 91 T.C. 273, 297 (1988). We have identified

various indicia of fraudulent intent.  <u>Id.</u> at 297-98.  These include:

- understatement of income;

- inadequate records;

- failure to file tax returns;

- implausible or inconsistent explanations of behavior;

- concealment of assets;

- failure to cooperate with tax authorities;

- engaging in illegal activities;

- attempting to conceal illegal activities;

- dealing in cash; and

- failing to make estimated tax payments.

<u>Id.</u> (citing <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307-08 (9th Cir. 1986), affg. T.C. Memo. 1984-601).  The Commissioner must also prove fraud for each year in issue.  See <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 210 (1992).

If the Commissioner meets his burden as to any portion of the underpayment, then we have to treat the entire underpayment as attributable to fraud except to the extent the taxpayer establishes, by a preponderance of the evidence, that a portion of the underpayment is not due to fraud.  Sec. 6663(b).

1.  <u>Fraud for 2000</u>

The Commissioner has met his burden with respect to the first element of fraud--he has shown that the Daouds underpaid their 2000 taxes.  Mr. Daoud even concedes that he wasn't

entitled to the loss reported on the sale of kitchen equipment. The second element, requiring the Commissioner to show fraudulent intent at the time the Daouds reported the loss, is a bit trickier.

This case is a good example of why we allow the Commissioner to prove fraudulent intent using circumstantial evidence and the taxpayer's entire course of conduct. Mr. Daoud claims that he reported the loss by mistake, and he asks us to believe that he first learned about it when the revenue agent brought it to his attention. We do not believe him--Mr. Daoud's credibility suffered during trial. His testimony was often suspect, and the records he provided have proven not to be what he said they were on many subjects.

The first indicium of fraud, understatement of income, can be shown by an overstatement of deductions. E.g., Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972). For 2000, Mr. Daoud reduced the Daouds' income by the $110,015 kitchen equipment loss, more than $200,000 in unsubstantiated Schedule C expenses, and more than $10,000 in unsubstantiated Schedule A deductions. These deduction overstatements are significant.

Mr. Daoud was also unable to substantiate expenses and deductions because the Daouds kept inadequate records--another indicium of fraud. He tried to disguise this shortcoming by throwing piles of documents at the revenue agent and counsel for

the IRS. These documents are spotty and disorganized. They include what appear to be falsified mileage logs and numerous receipts for personal items. And almost all of Mr. Daoud's records proved inadequate to substantiate the deductions and expenses he disputes.

Attempting to conceal fraudulent activity is another indicium of fraud present in this case. When asked to substantiate the $110,015 loss, Mr. Daoud gave the revenue agent the altered bid that he was trying to pass off as a contract for the purchase of equipment. He claims that he gave the document to the revenue agent because he panicked after finding out about his mistake. This story does not help his cause. Whatever his reasoning, he was trying to conceal his true income from the Commissioner and that shows fraud.

Further evidence of fraud, and perhaps the most damaging, is Mr. Daoud's implausible explanation of how the $110,015 loss got onto his return. He asks us to believe that while preparing his 2000 return he found a bid among his tax papers and he mistakenly entered it into Turbo Tax in a way that reduced his income by $110,015. Then months later, upon realizing his mistake, he found the bid again, altered it, and gave it to the revenue agent to substantiate the loss because he panicked. This is an implausible story: Mr. Daoud was actively negotiating for other bids from SILVA when the alleged mistake took place, so he was familiar with the document. The Daouds didn't sell any equipment

in 2000.  And why wouldn't he recognize his mistake when he completed the return and discovered that all they owed in taxes was $2,621 in self-employment tax?

The final indicium of fraud present in this case is the Daouds' failure to make estimated tax payments.  In 2000, the only tax payments they made were those that Ameritech withheld. With so many of the indicia of fraud present, we find that the Commissioner has met his burden and proved by clear and convincing evidence that a portion of the Daouds' 2000 underpayment was due to fraud.

We will therefore treat the Daouds' entire 2000 underpayment as fraudulent.  See sec. 6663(b).  This shifts the burden to Mr. Daoud to prove that some portion of that underpayment was not attributable to his fraud.  He argues, and we agree, that the deduction he reported for the jewelry he gave to his wife was not a result of fraud.  He identified the jewelry on the 2000 return as "gift to spouse."  This deduction shows disregard for the tax rules, but not fraudulent conduct.  As for the rest of the underpayment, Mr. Daoud hasn't tried to show that any other portion of it was not attributable to fraud beyond arguing that his records substantiate his deductions and expenses.

### 2.  Fraud for 2001

In his brief, the Commissioner attempts to conflate the penalty issue for 2000 and 2001, arguing the evidence of fraud without referring to the particular tax year he is addressing.

But we can't impute or presume fraud--it must be established by independent evidence for each tax year. See, e.g., <u>Niedringhaus</u>, 99 T.C. at 210; <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 699 (1989). Thus, we next look to see if there is clear and convincing evidence of an underpayment attributable to fraud for 2001.

The Commissioner did establish the first element: There clearly was an underpayment in 2001. The parties have even stipulated the fact that the Daouds should have reported the capital gain realized on the sale of their Irvine franchise. And as previously determined, the Daouds did take Schedule C deductions in 2001 to which they were not entitled.

As to the issue of fraudulent intent, we look at the various badges of fraud. The first one, an understatement of income, is shown by Mr. Daoud's unsubstantiated job search and Schedule C expenses, and his failure to report the gain realized when the Daouds sold their Irvine business. Mr. Daoud also failed to make estimated tax payments in 2001, another indicium of fraud. But these transgressions could also reflect mere negligence or a disregard of the Code and regulations.

The Commissioner argues that Mr. Daoud's education and experience elevate these omissions to fraud. The Commissioner, however, does not allege, and the record does not suggest, that Mr. Daoud had any expertise or specialized knowledge in tax law. We are not persuaded by the Commissioner's argument that Mr.

Daoud's general intelligence and prior experience of being audited are enough to prove an intent to evade taxes.

The Commissioner also alleges that Mr. Daoud tried to conceal his income in 2001 by "[burying] the sale of the Irvine franchise as a loss on Schedule D-1, following the list of stock sales." We are unpersuaded. Mr. Daoud, although incorrectly, did disclose the sale of the Irvine business on the returns. Moreover, the way he reported the sale shows an attempt to disclose information, not conceal it.

The Commissioner also points to Mr. Daoud's testimony regarding the mileage logs as proof of fraudulent intent. Mr. Daoud, however, did not use the mileage logs to substantiate any of his 2001 deductions. He testified that the mileage logs were exclusively for 2000, and only after the Commissioner's effective cross-examination did Mr. Daoud suggest that it was possible that some of the notations on the mileage logs were for 2001. This does not show an intent to evade his 2001 taxes, and in fact his not relying on it to shrink his 2001 tax bill shows the opposite. And the Commissioner does not allege any other misleading statements were made by Mr. Daoud about his 2001 return.

We can't help but find that Mr. Daoud kept inadequate records and was not always cooperative with the IRS for both years. But poor bookkeeping and frostiness toward IRS agents do not necessarily prove fraudulent intent. See Terrell Equip. Co. v. Commissioner, T.C. Memo. 2002-58; Piekos v. Commissioner, T.C.

Memo. 1982-602. The IRS does argue that Mr. Daoud had a pattern of underreporting his income and overstating his deductions. But a "pattern" of two years is thin soup, and not enough to let us find clear and convincing evidence of fraud for 2001. See <u>Loftin & Woodard, Inc. v. U.S.</u>, 577 F.2d 1206, 1239 (5th Cir. 1978) (finding that even a "consistent and substantial understatement of income is * * * [insufficient], by itself, to support a finding of fraud").

The Commissioner does not allege, and the evidence does not suggest, that Mr. Daoud fabricated, destroyed, or concealed documents related to his 2001 return. Given the weight of the evidence, we conclude that the Commissioner has failed to carry his burden of proving, by clear and convincing evidence, that any part of the 2001 underpayment was a result of fraud.

B.   <u>Section 6662 Accuracy-Related Penalty</u>

On the portion of the Daouds' deficiency not subject to section 6663, the Commissioner seeks a 20-percent accuracy-related penalty under section 6662 because of: (1) negligence, (2) disregard of the rules or regulations, or (3) a substantial understatement of income tax.

The Commissioner also wants Mrs. Daoud to be liable for an accuracy-related penalty on the portion of the underpayment already subject to Mr. Daoud's civil-fraud penalty. An accuracy-related penalty, however, cannot be imposed on one spouse where the other one is liable for fraud. See, e.g., <u>Zaban v.</u>

Commissioner, T.C. Memo. 1997-479.  Unlike the fraud penalty, which is imposed on each spouse separately, the accuracy-related penalty applies jointly and severally.  See Talmage v. Commissioner, T.C. Memo. 2008-34, affd. without published opinion 106 AFTR 2d 2010-5706, 2010-2 USTC par. 50,550 (9th Cir. 2010); Aflalo v. Commissioner, T.C. Memo. 1994-596.  Thus, to impose an accuracy-related penalty on Mrs. Daoud when her husband is liable for fraud is "impermissible stacking."  See, e.g., Zaban, T.C. Memo. 1997-479.  Therefore, we need to decide only whether the jewelry deduction and the Daouds' 2001 underpayment will be penalized under section 6662.

Once the Commissioner provides some evidence of negligence, disregard of the Code and regulations, or a substantial understatement, the burden of proving that the Commissioner got his penalty determination wrong shifts to the taxpayer.  See Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-47 (2001).  A taxpayer can shoulder this burden by showing that, under all the facts and circumstances, he acted with reasonable cause and in good faith.  Sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

Negligence, as the regulations define it, is the failure to make a reasonable attempt to prepare one's tax returns, keep adequate books and records, substantiate items properly, or otherwise comply with the Code.  Sec. 1.6662-3(b)(1), Income Tax Regs.  Disregard of the rules includes careless, reckless, or

intentional disregard of the Code provisions or regulations. Section 1.6662-3(b)(2), Income Tax Regs.  And an understatement is substantial if it is more than $5,000 or 10 percent of the tax required to be shown on the return, whichever is greater.  Sec. 6662(d)(1)(A).

We find that Mr. Daoud clearly disregarded the rules when he deducted the cost of jewelry given to his wife in 2000 as a business expense.  The Daouds don't argue otherwise.  The Daouds also claimed excessive Schedule C expenses on their 2001 return which they were unable to substantiate, disregarding the requirements of sections 162 and 274.

The fact that the Quicken reports do not match the amounts claimed on their returns buttresses our finding that these taxpayers were negligent in keeping their records and preparing their 2001 returns.  See Lysek v. Commissioner, 583 F.2d 1088, 1094 (9th Cir. 1978), affg. T.C. Memo. 1975-293.  The Daouds also ignored the depreciation deducted in prior years when calculating the adjusted basis of their Irvine business.  See Bissey v. Commissioner, T.C. Memo. 1994-540.  We therefore find them liable for a negligence penalty on their 2001 underpayment.

We also believe that we can sustain the section 6662 penalty on the distinct ground that the Daouds substantially understated their 2001 income tax.  If, as appears likely, their understatement of income tax as calculated under Rule 155 exceeds the greater of $5,000 or 10 percent of the tax required to be

shown on their 2001 return, the Commissioner has succeeded in defending the section 6662 penalty on this alternative ground.

The accuracy-related penalty does not apply if the taxpayer had reasonable cause and acted in good faith, sec. 6664(c)(1), but the Daouds failed to present any evidence or make any arguments addressing this defense. We therefore find that the accuracy-related penalty applies to the jewelry deduction they took in 2000 and to the full amount of their 2001 underpayment.

An order granting respondent's oral motion to conform the pleadings to the proof will be issued, and decision will be entered under Rule 155.